The defendant contended upon the trial, for the purpose of defeating plaintiff's cause of action, that there was no misrepresentation, because she was in fact delivered of a child, which was known by plaintiff to belong to him. The jury found against her upon this issue, and it was established by their verdict that no child was born to her. The defendant now makes the motion after final judgment against her in the Court of Appeals, on the ground that she has now discovered evidence which goes to establish the fact that the plaintiff, contrary to his sworn statement upon the trial, was living with her during the months immediately preceding the birth of the child, and, if any representation was made to him as to the fact she had a child born to her, he could not have been deceived thereby. The defendant did not make any serious effort to disprove plaintiff's statement upon the trial that he was not living with her for some time previous to the birth of the child for the obvious reason that she was relying upon the theory that there was actually a child. Having been defeated upon that theory, she, by her motion, in effect seeks an opportunity to shift her main ground of defense and place it upon the ground that, even if her first defense was false, and she actually had no child, the plaintiff should not succeed because of his stupidity in believing a representation made to him by her which he should have known was untrue. I do not think this shifting of position commends itself to the court, or would commend itself to the jury. In effect she claims that a jury should set their seal of approval upon her exceeding adroitness of deception. In view of the plaintiff's explanation of his signature in the receipt books of Cappa's Band, I doubt if much importance would be attached to the evidence by a jury. I am entirely confident it would not, and should not, change the result. The evidence is cumulative upon an issue litigated upon the trial, and could, with due diligence, have been produced upon the trial; and it would have undoubtedly been produced had not defendant then elected to defend upon an entirely different theory than would now be argued upon a retrial. I consider the application without merit; the necessary hazards and hardships of litigation are sufficiently burdensome at best. If such applications as this were to be seriously entertained, the administration of justice would justly cease to command respect.

Motion for reargument granted, and motion for new trial denied.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, HOOKER, RICH, and MILLER, JJ.

Hymes, Woytisek & Schaap (Edward Hymes, of counsel), for appellant.

Otto H. Droege, for respondent.

PER CURIAM. Order affirmed, without costs, upon the opinion of Mr. Justice Wilmot M. Smith, at Special Term.

---

### SENIOR v. NEW YORK CITY RY. CO.

(Supreme Court, Appellate Division, First Department. February 9, 1906.)

CARRIERS—STREET RAILWAYS—TRANSFER—OBLIGATION TO ISSUE—OPERATION AND CONTROL OF ROAD—WHAT CONSTITUTES.

Under Railroad Law, Laws 1890, p. 1113, c. 565, § 101, as amended by Laws 1897, p. 776, c. 688, relating to street surface railroads, and providing that no corporation constructing and operating a railroad under the provisions of this article, etc., shall charge any passenger more than five cents for one continuous ride from any point on its road, "or on any road, line or branch operated by it, or under its control," to any other point thereof, etc., and Railroad Law, Laws 1890, p. 1096, c. 565, § 39, imposing a penalty on any railroad corporation receiving more than the lawful rate of fare, etc., the operation or control of a road within the

meaning of such sections means a control of the operation of the road, and not merely a control of the corporation or individuals operating it by reason of the ownership of a majority of the road's capital stock.

     O'Brien, P. J., and Clarke, J., dissenting.

Appeal from Appellate Term.

Action by Hugh H. Senior against the New York City Railway Company. Judgment for defendant, and plaintiff appeals. Affirmed.

Argued before O'BRIEN, P. J., and INGRAHAM, CLARKE, LAUGHLIN, and HOUGHTON, JJ.

Hampton D. Ewing, for appellant.

Adrian H. Joline, for respondent.

INGRAHAM, J. The plaintiff was a passenger upon the defendant's railroad on Lexington avenue. At Forty-Second street he requested a transfer from the Lexington avenue line, entitling him to ride upon the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railway so .as to carry the plaintiff over that road without the payment of additional fare. This demand was refused. Plaintiff then boarded the Forty-Second street car, but was required to pay his fare, and he brings this action to recover the penalty imposed by section 101 of the railroad law (chapter 565, p. 1113, of the Laws of 1890, as amended by chapter 688, p. 776, of the Laws of 1897). The complaint alleges that the railroad on Forty-Second street was operated by the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railway Company, and that the conductor thereof was in the employ of the said company and one of its servants; that the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railroad Company is a street surface railroad corporation, organized under the laws of the state of New York, for the purpose of building, maintaining, and operating a road through, upon, and along certain streets, avenues, and places in the city of New York, and had an authorized capital stock of $2,500,000, consisting of 25,000 .shares of $100 each; that the defendant, the New York City Railway Company, was the owner of an amount in excess of 90 per cent. of the total shares of the capital stock of the Forty-Second Street, Manhattanville & St. Nicholas Railroad Company, and that by reason thereof it controlled and managed, through the directors and officers of said Forty-Second Street, Manhattanville & St. Nicholas Railroad Company, the affairs of said company and said railroad of said company on Forty-Second street, and that the refusal of the defendant to give the plaintiff a transfer over the said line of street railway on 'Forty-Second street and to carry the plaintiff on said line over Forty-Second street without the payment of additional fare was in violation of section 101 of the railroad law of the state of New York, and that by virtue of the provisions of the said section, and also of the provisions of section 39 of the said law, the defendant has become and now is indebted to the plaintiff in the sum of $50. The answer of the defendant admits that it is the owner of 24,698 shares of the capital stock of the Forty-Second Street Railroad Company, but that of such stock 16,711 shares are held by the Morton Trust Company, subject to the authority expressed in a certain mortgage made by the Third Avenue Railroad

Company to the Morton Trust Company, as trustee, bearing date May 15, 1900, and denies that by reason of such stockholding it controlled or managed through the directors or officers of the Forty-Second Street Company, or otherwise, the affairs of said company or said railroad of said company on Forty-Second street, but, on the contrary, alleged that the entire control, management, and operation of said railroad was under the power of the board of directors duly elected by the stockholders of the company and of the officers elected and appointed by such board, and further denying that the said street surface railroad on Forty-Second street and the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railroad was under the control of the defendant.

Upon the trial it was proved that on the 25th day of June, 1900, the Third Avenue Railroad Company was the owner of 16,646 shares of the capital stock of the Forty-Second Street, Manhattanville & St. Nicholas Railroad Company; that on that day this stock was transferred to the Morton Trust Company, as trustee, and held by it subject to the provision of a mortgage made by the Third Avenue Railroad Company; and that there was subsequently transferred to the Morton Trust Company, as trustee, 55 additional shares of the stock of the said company, making a total of 16,701 shares which were held by the trust company. There was offered in evidence a lease from the Third Avenue Railroad Company to the Metropolitan Street Railway Company, dated April 13, 1900, by which the Third Avenue Railroad Company leased for 999 years its road, extending from Park Row and Broadway, through Park Row, the Bowery, and Third avenue to the Harlem river, and also a line upon 125th street, with certain real estate, and also "all easements, fixtures, personalty and property of every description of the party of the first part," which property included the 16,701 shares of the stock of the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railroad Company held by the trust company, being a majority of the capital stock of the company. It was also stipulated that, in addition to the 16,701 shares held by the Morton Trust Company, as trustee, 7,545 shares of the stock of the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railroad were on the 16th day of December, 1902, acquired by the Metropolitan Street Railway Company and afterwards by the defendant, and this stock was thus held prior to the commencement of the action.

On behalf of the defendant, the president of the Forty-Second Street Company was called as a witness, and testified that he had been president of the company since March, 1900, elected each year at the annual meeting of the stockholders; that he was operating the road prior to March, 1900, as superintendent; that in March, 1900, the road went into the hands of a receiver, and was in the possession of a receiver about a year and four months; that at the termination of the receivership the witness was president of the road, and that since then the road has been operated and controlled by the directors and officers of the road; that the proceeds from the operation of the road were deposited in a bank in the name of the Forty-Second, Manhattanville & St. Nicholas Railroad Company; contracts for supplies are all made by him as president, and the bills are paid by him out of the receipts from the operation of the road; that there was no physical connection

between the two roads. The cars of the defendant line are not run over the tracks of the Forty-Second Street Company, and the cars of the Forty-Second Street Company are not run over any of the tracks of the defendant corporation, and the tracks of the two roads were not connected. None of the directors of the defendant road were directors of the Forty-Second Street Company. From the facts thus established it' would seem that these two corporations are entirely distinct, managed by different officers and directors, and the roads are operated as distinct and independent lines.

There are existing between the roads no contract relations of any kind. The plaintiff, however, claims that the defendant was bound to issue a transfer which would entitle him to a continuous ride over the defendant's road and over the Forty-Second Street Road, as the defendant had the ownership of a majority of the stock of the Forty-Second Street Road, which operated and controlled its own railroad. A majority of the stock of the Forty-Second Street Company was held by the Morton Trust Company, as trustee, to secure certain bonds issued by the Third Avenue Railroad Company, who, at the time of the issuance of these bonds, was the owner of this stock; but under the mortgage the Third Avenue Railroad Company had reserved the right to vote on this stock at the election of the directors of the company, so long as there was no default in the payment of the interest or principal of the bonds to secure which the stock was pledged to the Morton Trust Company. So that at the time of the demand for a transfer by the plaintiff the defendant had the right to vote upon a large majority of the stock of the Forty-Second Street Company, and thus could, by means of its voting power, elect such persons trustees as it wished. It would seem that the minority stockholders of the Forty-Second Street Road could have objected to the officers of that company carrying passengers over its road because they had paid a fare upon the defendant road. The Forty-Second Street Road had secured no advantage because of the acquisition by the defendant of a majority of the stock of the Forty-Second Street Road, nor was the Forty-Second Street Road in any way bound to accept a transfer issued by the defendant as fare upon its road, if one had been issued by the defendant. There was no contract, lease, or arrangement of any kind between the two roads. The Forty-Second Street Company had never accepted a benefit under the railroad law by which there was imposed upon it the obligation to carry a passenger without payment of fare because such passenger had paid a fare upon the defendant's road. The liability for this penalty for which the plaintiff sues must depend upon the failure of the defendant corporation to perform some duty imposed upon it by law. The refusal of the officers and employés of the Forty-Second Street Road to permit the plaintiff to ride upon its line without paying the legal fare was not the violation of a duty imposed upon the defendant, unless it in some way was bound to compel the Forty-Second Street Line to transport a passenger without payment of fare because he had paid the legal fare to the defendant for a ride on its road. The only way that the defendant could have controlled the Forty-Second Street Line was that at the next annual election it could have elected directors

who would obey the orders of the defendant. If orders had been given by the defendant corporation to the Forty-Second Street Road to carry its passengers without payment of fare, the minority stockholders would have had the right to object and to hold the directors and officers of the Forty-Second Street Company to account for failing to perform their duties for the benefit of the Forty-Second Street Company.

Keeping in mind the relation between the two companies, I think that section 101 of the railroad law, under which the plaintiff seeks to recover, does not apply. Section 101 of the railroad law is a part of article 4, relating to street surface railroads. That section, as amended by chapter 688, p. 776, of the Laws of 1897, provides:

"No corporation constructing and operating a railroad under the provisions of this article, or of chapter two hundred and fifty-two of the laws of eighteen hundred and eighty-four, shall charge any passenger more than five cents for one continuous ride from any point on its road, or on any road. line or branch operated by it, or under its control, to any other point thereof, or any connecting branch thereof, within the limits of any incorporated city or village."

Section 39 of the railroad law provides "that any railroad corporation which shall ask or receive more than the lawful rate of fare * * * shall forfeit fifty dollars to be recovered with the excess so received by the party paying the same," and the plaintiff claims that the defendant received more than the lawful rate of fare because the Forty-Second Street Railroad required him to pay a fare after he had paid the defendant his fare on the Lexington Avenue Line, and thereby incurred this penalty. The defendant was authorized to charge five cents to ride upon its line of railway. It demanded and received from the plaintiff five cents as his fare upon the Lexington avenue car. When he got out of that car and got upon the line of the Forty-Second Street Railway, the employé of that company demanded and received from him five cents for a ride upon that line. It would seem that this defendant has not charged or received more than one fare. There is no evidence that the defendant profited in any way by the fare that was paid to the Forty-Second Street Road, or that it had authorized or directed that company to charge or receive fare from the plaintiff for using its line. It had directly nothing to do with asking or receiving the fare that was demanded by the employé of the Forty-Second Street Company. It could not carry the plaintiff upon the line of the Forty-Second Street Railway, for it did not operate that line, and had no direct control over its operation, and the defendant did not ask or receive any fare for transporting the plaintiff over the Forty-Second Street Line.

Section 101 of the railroad law provides that:

"No corporation constructing and operating a railroad * * * shall charge any passenger more than five cents for one continuous ride from any point on its road, or on any road, line or branch operated by it, or under its control, to any other point thereof, or any connecting branch thereof."

Before a railroad company can violate this act it must charge a passenger more than five cents for a passage over its road, or a road operated by it or under its control. Assuming that the Forty-Second

Street Company may in a sense be said to be under the control of the defendant because it owns a majority of the stock of the corporation, still the defendant would not be guilty of charging excessive fare unless it charged a passenger for a ride over the connecting road. The evidence is undisputed that the defendant made no such charge; but it seems to me that the operation or control of a road here spoken of necessarily means the control of the operation of the road, and not merely a control of the corporation or individuals who operate it. A person owning a majority of stock in a corporation cannot be said to be in control of the management of the property of the corporation. He has a control over the corporation so far as he has the power to elect its directors, but the corporation is itself a person and such corporation actually owns and controls its property. The provision here does not relate to the control of the corporation by its stockholders, but to the control of the operation of a railroad by those charged with that duty, as distinguished from the control of a person who operates the railroad. It would be quite absurd to speak of a person owning a majority of the stock of a corporation as being the owner of the property, or as controlling the use to which the property should be put. He may be said in a sense to control the corporation, but the corportion itself owns its property and controls and manages it; and it seems to me that the word "control" as used in section 101 of the railroad law, in connection with the word "operate," as applying to a corporation which operates or controls another road, applies to the direct operation or control of the operation of the specific railroad sought to be brought within the provisions of the act, and not to the indirect control over a corporation which owns the road by its stockholders. Each railroad corporation operating or controlling a railroad is entitled to charge five cents for one continuous ride from any point on its road, or on any road, line, or branch operated by it, or under its control; and the Forty-Second Street Road was entitled to charge the plaintiff five cents for a ride upon its road, operated and controlled by it, and the defendant was authorized to charge the plaintiff five cents fare for a ride on its road, operated or controlled by it, and this is just what these two corporations did. There was therefore, as I view it, no excessive fare charged or paid, and the Municipal Court was quite right in refusing to award the plaintiff a judgment.

It follows that the determination appealed from should be affirmed, with costs.

LAUGHLIN and HOUGHTON, JJ., concur.

CLARKE, J. I dissent. The statute imposes a duty to the public on corporations which derive all their powers and privileges from the people of the state, and should be liberally construed in the public interest. When either of two constructions of a statute is possible, "the interpretation must be adopted which is most favorable to the state." Mr. Justice Harlan, in Coosaw Mining Co. v. South Carolina, 144 U. S. 550, 561, 12 Sup. Ct. 689, 36 L. Ed. 537, cited with approval in Minor v. Erie R. R. Co., 171 N. Y. at page 573, 64 N. E. 456. O'Reilly v.

Brooklyn Hts. R. R. Co., 95 App. Div. 261, 89 N. Y. Supp. 41, affirmed 179 N. Y. 450, 72 N. E. 517. "This is a statute extending the rights of the individual and 'to the end that public convenience may be promoted' and is to be liberally construed and strictly enforced to accomplish its object," said Mr. Justice Woodward in Jenkins v. Brooklyn Hts. R. R. Co., 29 App. Div. 8, 51 N. Y. Supp. 216, construing section 104 of chapter 565, p. 1114, of the Laws of 1890, as amended by chapter 676, p. 1406, of the Laws of 1892, in regard to transfers. In Griffin v. Interurban St. Ry. Co., 179 N. Y. at page 447, 72 N. E. 516, Judge Bartlett said:

"In some of the cases in the lower courts, in construing section 104, in regard to the liability of companies under lease to grant transfers to passengers, the meaning of the words in that connection, 'to the end that public convenience may be promoted by the operation of railroads embraced in such contract substantially as a single railroad with a single rate of fare,' have been construed as a legislative intimation that certain transfers might be demanded that would not be required in seeking to promote the public convenience. In the cases before us this language establishes the propriety of the transfers demanded."

It appears that, if one road operates or controls another by contract or by lease, the transfers are demandable. Is it not the intention that if these intramural transportation companies, enjoying the enormous advantages of public franchises in the public streets, combine, in any way, as a consideration therefor, they shall grant to the public continuous trips at a single fare? We cannot close our eyes in these days of great combinations of capital to the facts in regard to street railway matters in this city. We cannot be blind to the practical result of open facts. It is in evidence here that the defendant, the City Railway Company, owns 24,698 shares of the 25,000 shares of the capital stock of the Forty-Second Street Company. While it is true that each company has a separate board of directors, yet they have a common treasurer. It seems to me a technical, narrow, and unreasonable construction to hold that, within the meaning of this statute, the defendant does not control the Forty-Second Street Company. Speaking after the manner of men, how long would the nominal board of directors of that company remain in office if they ran counter to the wishes or directions of the owner of 99 per cent. of the stock? The very title papers of the defendant express this relationship of control where one company owns a sufficient amount of the stock of another. The indenture between the Third Avenue Railroad Company and the Metropolitan Street Railway Company of April 13, 1900, uses this language:

"And whereas the party of the first part is the lawful owner of the following amounts of the capital stock of the following named railroad companies (hereinafter referred to as 'controlled companies') all of which are operating or were organized to operate street railroads in said City of New York," etc.

And among these is the stock of the Forty-Second Street Railroad Company, and throughout the lease it is referred to as a "controlled company." In the mortgage from the Third Avenue Railroad Company to the Morton Trust Company the same language is used. There seemed to have been no doubt in the minds of the draftsmen of those instruments, or of the officers who executed them, as to whether the

ownership of the stock did not carry with it the control of the company.

In Farmers' Loan & Trust Co. v. New York & Northern Railway Co., 150 N. Y. 410, 425, 44 N. E. 1043, 1046 (34 L. R. A. 76, 55 Am. St. Rep. 689), it was said:

"The clear and legitimate inference to be drawn from the circumstances found in this case is that after the New York Central Railroad Company purchased a majority of the stock and bonds of the New York & Northern Railway Company it controlled its officers and directors as fully and completely as though they had been elected by its votes. * * * Indeed, it is a matter of common knowledge that, when the ownership of a majority of the stock of such a corporation changes, the board usually changes unless its members are already in harmony with the policy of the purchasers."

In Pearsall v. Great Northern Railway Co., 161 U. S. 646, 16 Sup. Ct. 705, 40 L. Ed. 838, in considering acts of the Legislature of Minnesota prohibiting railroad corporations from consolidating with, leasing, or purchasing or in any other way becoming the owner of or controlling any other railroad corporation or the stock, franchises, or rights of property thereof having a parallel or competing line, Mr. Justice Brown said:

"The Northern Pacific Road also controls by its own construction and by the purchase of stock other roads extending from the Mississippi river to the Pacific Ocean. * * * The fact that one-half of the capital stock of the reorganized company is to be turned over to the shareholders of the Great Northern, which is, in turn, to guaranty the payment of the reorganized bonds, is evidence of the most cogent character to show that nothing less than a purchase of a controlling interest and practically the absolute control of the Northern Pacific is contemplated by the arrangement. With half of its capital stock already in its hands, the purchase of enough to make a majority would follow almost as a matter of course, and the mastership of the Northern Pacific would be assured."

In United States v. Northern Securities Co., (C. C.) 120 Fed. 721, the court was construing a public statute. There, as in the case at bar, the subsidiary companies had complete organizations and kept up completely their separate entities. The Circuit Court said:

"It will not do to say that so long as each railroad company has its own board of directors they operate independently, and are not controlled by the owner of the majority of their stock. It is the common experience of mankind that the acts of corporations are dictated, and that their policy is controlled by those who own the majority of their stock. Indeed, one of the favorite methods in these days, and about the only method, of obtaining control of a corporation, is to purchase the greater part of its stock. * * * So long as directors are chosen by stockholders, the latter will necessarily dominate the former and in a real sense determine all important corporate acts."

On appeal to the Supreme Court, 193 U. S. 328, 24 Sup. Ct. 453, 48 L. Ed. 679, the court said:

"The Circuit Court was undoubtedly right when it said, all the judges of the Circuit concurring, that the combination referred to 'led inevitably to the following results: First, it placed the control of the two roads in the hands of a single person, to wit, the Securities Company, by virtue of its ownership of a large majority of the stock of the companies.' "

Mr. Justice Brewer, concurring, in speaking of the Northern Securities Company, said:

"It is an artificial person, created and existing only for the convenient transaction of business. In this case it was a mere instrumentality by which separate railroad properties were combined under one control."

My conclusion is that the defendant controls the Forty-Second Street Road as much as if the boards of directors were identical, as if it had a lease or a traffic contract or owned every share of its stock. The determination of the Appellate Term should be reversed.

O'BRIEN, P. J., concurs.

LAUGHLIN, J. (concurring). By permitting one street railway corporation to own a controlling interest in the stock of another, competition is more or less stifled, and it would seem that there should be an interchange of transfers, so that passengers may make a continuous journey in one general direction over both lines for a single fare. The remedy, however, must be found in the Legislature. It will not, in my opinion, do for the courts to hold that the directors elected by the corporation owning a majority of the stock are subservient to that corporation and are in all cases justified in carrying out its wishes, so that it may be said to control the other corporation.