# COOSAW MINING COMPANY *v.* SOUTH CAROLINA.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF SOUTH CAROLINA.

No. 1448. Argued March 14, 15, 1892. — Decided April 4, 1892.

The statute of the State of South Carolina, passed March 28, 1876, (acts of 1875–6, p. 198,) is capable of being construed either, when taken by itself, as conferring upon the Coosaw Mining Company the exclusive right of

digging, mining and removing phosphate rocks for an unlimited period, so long as it should comply with the terms of the statute, or, when taken in connection with the act of March 1, 1870, 14 Gen. Stats. So. Car. 381, as conferring such a right only for "the full term of 21 years" named in the latter act; and as the interpretation should be adopted which is most favorable to the State, it is *Held*, that such exclusive right expired on the termination of the 21 years named in the act of 1870.

Only that which is granted in clear and explicit terms passes by a legislative grant of property, franchises or privileges in which the government or the public has an interest.

A court of equity has jurisdiction over a bill filed by a State to prevent illegal interference with its control of the digging, mining and removing phosphate rock and phosphate deposits in the bed of a navigable river within its territories.

THE court stated the case as follows:

This suit was brought by the appellees, March 23, 1891, in one of the courts of South Carolina, and, subsequently, on the petition of the appellant, the defendant below, was removed into the Circuit Court of the United States. 45 Fed. Rep. 804. Its object was to obtain a decree enjoining the Coosaw Mining Company, its servants, agents and employés, from claiming any right, title, interest or grant in or to the phosphate rock and phosphatic deposits in Coosaw River in that State; from digging, mining or removing such rock and deposits in the bed of that river; and from obstructing by suit or otherwise any agent or other person, acting by authority of the State Board of Phosphate Commissioners, from digging, mining and removing the same.

The appellant claimed, in its answer, to have a contract with the State by which it acquired an exclusive right for an indefinite period to occupy, dig, mine and remove such rocks and deposits in Coosaw River, and that, in violation of the Constitution of the United States, the obligation of its contract had been impaired by a subsequent act of the legislature.

The decree below, rendered September 16, 1891 — the Chief Justice and Judge Simonton concurring — proceeded upon the ground that the appellant did have, at one time, and for a limited period, a contract with the State, of the kind mentioned, but that such period had expired before the insti-

tution of this suit. *South Carolina* v. *Coosaw Mining Co.*, 47 Fed. Rep. 225. The relief asked was, therefore, granted.

. The principal question to be considered depends upon certain legislative enactments relating to phosphate rocks and phosphatic deposits in the navigable waters of South Carolina. It is necessary to ascertain the scope of those enactments. '

By an act which took effect March 1, 1870, the State granted to certain named persons and their associates the right, for the full term of twenty-one years, to dig, mine and remove phosphate rocks and phosphatic deposits from the beds of the navigable streams and waters within the jurisdiction of the State of South Carolina. This grant was made upon the express condition that the grantees pay the State one dollar per ton for every ton of phosphate rock and phosphatic deposits, so dug, mined and removed, and five hundred dollars as a license fee before commencing business under the grant.

The act further provided that before commencing operations under authority of the act, the grantees, and their associates, should file, or cause to be filed, in the office of the state auditor, a bond in the sum of fifty thousand dollars, conditioned that they would make true and faithful returns to that officer, annually, on or before the first day of October, and oftener, if required, of the number of tons of phosphate rocks and phosphatic deposits dug, mined and removed by them, and punctually pay to the state treasurer, annually, on the first day of October, one dollar per ton for every ton of rocks and deposits by them so dug, mined and removed, during the year preceding; such bond to be renewed annually, and approved by the attorney general. 14 Gen. Stats. S. C. p. 381.

The Coosaw Mining Company, it is admitted, succeeded to all the rights given by this act.

On March 28, 1876, another act was passed entitled "An act to settle definitely the period at which returns shall be made of phosphate rocks and phosphatic deposits dug and mined in the beds of the navigable streams and waters of the State of South Carolina and the royalty shall be paid thereon, and also to fix the terms on which this act may be accepted by the parties named therein." This act is the foundation of

the appellant's claim of an exclusive right, for an indefinite period, to dig, mine and remove phosphate rocks and phosphatic deposits in that part of Coosaw River which it occupies. Its provisions are, therefore, given in full as follows:

" Whereas differences have arisen between the Coosaw Mining Company and the comptroller general as to the times and manner in which the said company shall make their returns of the number of tons of phosphate rocks and phosphatic deposits dug, mined and removed by them from the beds of the navigable streams and waters of the State, and also as to the times when the royalty thereon shall be paid; therefore, for remedy thereof,

" SECTION 1. *Be it enacted,*" etc., " That the said Coosaw Mining Company and all other companies and persons engaged in digging, mining and removing phosphate rocks and phosphatic deposits from the bed of the navigable streams and waters of the State shall be, and they are hereby, required, from and after the passage of this act, to make to the comptroller general true and faithful returns of the number of tons of phosphate rocks and phosphatic deposits they have so dug, mined and removed and shipped, or otherwise sent to market, at the end of every month; and shall punctually pay to the state treasurer the royalty already provided by law to be paid thereon at the end of every quarter or three months, the first quarter to commence to run on the first day of March in the present year.

" SEC. 2. That the said Coosaw Mining Company, and all other companies and persons mentioned in the preceding section, shall, within ten days from the passage of this act, enter into new bonds, in the penal sums and in the manner and form already provided by law, but conforming, in their conditions, to the terms set forth in the said preceding section, and also pay to the state treasurer the royalty accrued up to the said first day of March of the present year. And whereas it is desirable that the said Coosaw Mining Company, and all other companies and persons engaged in digging, mining and removing phosphate rock and phosphatic deposits as aforesaid, shall accept the terms of this act, in order to make it binding on

them respectively; and whereas the said Coosaw Mining Company have already occupied so much of the Coosaw River as lies opposite to and south of Chisolm's Island, whereon their works are located, and to the marshes thereof, and have expended large sums of money in establishing themselves thereon with sufficient mining plant for mining and preparing for market the phosphate rocks and phosphatic deposits of that part of the said Coosaw River; therefore, in consideration thereof,

"SEC. 3. That the said Coosaw Mining Company, on accepting the terms of this act within ten days from the passage thereof, shall thenceforth have the exclusive right to occupy and dig, mine and remove phosphate rock and phosphatic deposits from all that part of the said Coosaw River above mentioned so long as and no longer than they shall make true and faithful returns of the number of tons thereof they shall so dig, mine and remove, and ship or otherwise send to market, and punctually pay the royalty thereon, as provided in the first section of this act.

"SEC. 4. That all other companies and persons engaged in digging, mining and removing phosphate rocks and phosphatic deposits as aforesaid under gift and grant of the State of South Carolina or by authority thereof, who shall accept the terms of this act within ten days from the passage thereof, shall thenceforth have the same exclusive right where they have respectively occupied and established themselves for mining purposes, and on the same limitations as are prescribed in the preceding section of this act.

"SEC. 5. That all acts and parts of acts inconsistent with this act be, and they are hereby, for the purpose of this act, repealed." Acts of South Carolina, 1875-6, p. 198.

The appellant accepted the terms of that act, and thereby, it is contended, acquired the exclusive right in question. The act which is supposed to have impaired the obligation of its contract with the State was that of December 23, 1890, creating a Board of Phosphate Commissioners, consisting of the governor, attorney general, comptroller general and two individual citizens, charged with the exclusive control and protec-

tion of the rights and interest of the State in the phosphate rocks and phosphatic deposits in its navigable streams and marshes. The latter act empowered the Board — if, upon full investigation and examination, they deemed it advisable — to require all persons or corporations digging or mining phosphate rock or phosphatic deposits in the navigable streams and marshes of the State, to pay a royalty not to exceed two dollars per ton for all or any phosphate rock so dug or mined, six months' notice being given before raising the royalty above one dollar.

It also authorized and directed the Board after the first day of March, 1891, "to take possession and control of the Coosaw River phosphate territory heretofore occupied by the Coosaw Mining Company," and to issue licenses to mine and remove therefrom phosphate rock and phosphatic deposits, in like manner as was then provided by law for the other navigable streams and waters of the State; each ton of phosphate rock or phosphatic deposits, the product of such mining operations, to be deemed the property of the State until the said parties paid thereon a royalty, to be fixed by the Board, at not exceeding two dollars per ton on each ton of phosphate rock or phosphatic deposits dug, mined and removed, and six months' notice to be given before raising the royalty above one dollar.

It was further provided that if any person interfered with, obstructed, molested or attempted to interfere with, obstruct or molest, the Board, or any one by them authorized or licensed, in the peaceable possession and occupation for mining purposes of any of the marshes and navigable streams and waters of the State, it was authorized, in the name and on behalf of the State of South Carolina, "to take such measures or proceedings as they may be advised are proper to enjoin and terminate any such molestation, interference or obstruction, and place the State, through its agents, the said Board of Phosphate Commissioners, or any one under them authorized, in absolute and practicable possession and occupation of the same."

Other sections of the act made it an offence, punishable by fine or imprisonment or both, at the discretion of the court,

for any person or persons to wilfully interfere with, molest or obstruct, or attempt to interfere with, molest or obstruct, the State or the Board of Phosphate Commissioners, or any one by them authorized or licensed, in the peaceable possession and occupation of any of the said marshes and navigable streams and waters of the State, " including the said Coosaw River phosphate territory," or who shall dig or mine, or attempt to dig or mine, any of the phosphate rock or phosphatic deposits of this State, without a license so to do by the Board. The Board were authorized and empowered to inquire into and protect the interests of the State in and to any phosphate deposits or mines, whether in the navigable waters of the State or in land marshes or other territory, owned or claimed by other parties, and in the proceeds of any such mines, and to take such action for or in behalf of the State in regard thereto as they might find necessary or deem proper. All acts or parts of acts inconsistent with the provisions of the act of 1890 were repealed. Acts of South Carolina, 1890, p. 691.

Mr. *Augustine T. Smythe* and Mr. *Edward McCrady* for appellant.

I. The courts have no jurisdiction in equity over this case. The essential prerequisite to the jurisdiction of courts of equity is that there is no adequate remedy at law — otherwise the constitutional right to a trial by jury would be invaded and taken away. This fundamental rule has prevailed in England from the inception of equity jurisprudence, and always in the United States. *Hipp* v. *Babin*, 19 How. 271; *Parker* v. *Winnipiseogee M'f'g Co.*, 2 Black, 545; *Grandchute* v. *Winegar*, 15 Wall. 355, 373; *Lewis* v. *Cocks*, 23 Wall. 466; *Ellis* v. *Davis*, 109 U. S. 485; *Killian* v. *Ebbinghaus*, 110 U. S. 568; *Fussell* v. *Gregg*, 113 U. S. 550; *United States* v. *Wilson*, 118 U. S. 86; *Whitehead* v. *Shattuck*, 138 U. S. 146; *Scott* v. *Neely*, 140 U. S. 106; *Smyth* v. *N. O. Canal and Banking Co.*, 141 U. S. 656.

In the case before the court the complainant does not allege even that it is in possession of the property, or that such pos-

session has been disturbed, or that its right has been established. The fact is that the defendants have done nothing except submit the question at issue to the courts for settlement, and this is now pending, and complainant's right has never been established otherwise than in this proceeding. There is, therefore, no equity here.

Equity will not permit its remedies to be used to turn out one who is in possession. *People* v. *Simonson*, 10 Michigan, 335; nor to prevent one, who is in possession and claiming title, from reaping the legitimate fruits of possession. *Bell* v. *Chadwick*, 71 No. Car. 329; *Baldwin* v. *York*, 71 No. Car. 463. Even if neither party be in possession, the court will not interfere by injunction. *St. Louis, Kansas City &c. Railway* v. *Dewees*, 23 Fed. Rep. 691.

The appellees have a plain, adequate and complete remedy at law: (1) By action to determine and establish the disputed right to the property: (2) Under the general statutes of South Carolina: and it follows that the court below was without jurisdiction.

II. The statute of 1876, properly construed, conferred upon the Coosaw Mining Company, after its acceptance of it, an exclusive right for an indefinite period, so long as it complied with the terms of the act.

The general rule for construing statutes is, that where the meaning of the statute is plain, it is the duty of courts to construe it according to its obvious terms. In such a case there is no necessity for construction. *United States* v. *Wiltberger*, 5 Wheat. 76; *United States* v. *Reese*, 92 U. S. 214, 244; *United States* v. *Central Pacific Railroad*, 118 U. S. 235, 240; *Louisville Gas Company* v. *Citizens' Gas Company*, 115 U. S. 683, 697.

Statutes, which are binding on States as contracts, are to be construed as contracts between natural persons, and no advantage is to be given to the State in such construction. Bac. Abr. Tit. Prerogative; *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 344, 469; *Richards* v. *Dagget*, 4 Mass. 534, 537; *McMullen* v. *McCullough*, 2 Bailey (S. C.) 346; *Morton* v. *Comptroller General*, 4 So. Car. 430, 448; *Curran* v. *Arkan-*

*sas,* 15 How. 304, 308; *Murray* v. *Charleston,* 96 U. S. 442, 445; *Tennessee* v. *Whitworth,* 117 U. S. 139.

The Coosaw Mining Company was not a corporation. It was a mining partnership, and, as such, not subject to legislative control. It was already in possession and actual occupation of the entire Coosaw River, and further had the right to mine in all the other waters of the State in which it was mining, which contract the State could not alter without its consent. Differences had arisen between the company and the State as to the construction of that contract which it was desirable to settle.

The act in its title sets out, that it is to "settle" — not prescribe — that is, to amicably arrange existing differences, — and to define the period of making returns, and also to fix the terms on which it might be accepted.

The act then lays down the terms desired on the part of the State as new terms, to be suggested to the company, and as constituting a new contract between the company and the State.

The act admits that unless consented to by the company, the terms of the act would not be binding upon them, and that it was desirable on the part of the State that the company should accept, and make themselves liable to the terms of the act.

And the act further admits that the company had already expended large sums of money in the purchase of sufficient plant, to mine certain portions of the Coosaw River.

It proposed, therefore, to the company, that, in consideration of their accepting the terms stated in the act, and in consideration of the expenditures which they had made, and for the further condition, implied in the act, that they were to continue to maintain such plant and continue such operations theretofore conducted, it should have the exclusive right to mine in that part of the Coosaw River only so long as, and no longer than, they should make true and faithful returns and pay the royalty prescribed in the act.

Assuming this to be a contract between individuals, would any question be made as to the right of the company to con-

tinue their mining operations, so long as they fulfilled the conditions contained in the contract.

The legislature itself recognizes the fact that a consideration has been asked and paid; that both sides have given and taken, and that the terms and conditions of the contract as expressed in the act are therefore binding on both sides.

Is not this, therefore, a contract, based upon valuable consideration, paid to the State by the company? If so, then, under the cases cited, it must be construed as though the contract was made between the individuals.

And if it is, then it must be construed in favor of the company, for the only ground upon which the court below rested its decision in favor of the State, was that it must be construed liberally to the State, and all doubts resolved in her favor.

In construing the act of 1876 no reference can be made to the act of 1870. The established principle is, that while recourse may be had to the doctrine of *in pari materia* to resolve a doubt, it can never be called into action to create a doubt; that when the wording of a statute is clear in itself and leads to no absurd conclusions, it is not allowable to go elsewhere in search of conjectural constructions; and that when there is a difference between an older and a junior statute, especially where the latter has a repealing clause, it is presumed that the legislature intended that there should be a difference, and the prior act must be considered repealed.

The rule of construction "*in pari materia*" is resorted to for the purpose of ascertaining the meaning of a statute, when explanation is necessary, either because of seeming conflict in its own provisions, or incompleteness of detail in its subject matter, or a doubt as to the sense in which uncertain words or phrases are used. In such cases, and to preserve harmony and consistency, the rule is resorted to.

But the rule carries the limitation, that where the statute is itself plain, the rule cannot be resorted to; nor can its clear language be controlled by the supposed policy of a former one. Therefore where the words of a statute, as in this case,

are not doubtful, these words are the best guide to legislative. intention, and if they differ from former acts, it must be held that the legislature in using them, intended that there should. be a difference. The act of 1876, set out expressly to make alterations and changes in the existing law, and in order that there might be no question or doubt as to this purpose, adds the clause repealing all acts or parts of acts inconsistent with the provisions of this act. It seems impossible to add by way of argument anything which would make more clear, or more plain, the declaration in the act sustaining the claim of the defendants to the continuing right to mine, in Coosaw River, than the words : "That upon accepting the terms of the act they should have exclusive right to occupy and mine in said river, 'so long as and no longer than' they should make true and faithful returns of the number of tons, and punctu- ally pay the royalty thereon." Upon this the defendants stand. They have made true and faithful returns, and have punctually paid the royalty on the rock mined, as provided in the section of the act, and having so done, they claim the right to continue to dig, and to mine in said territory, "*so long as and no longer than*" said conditions shall be fulfilled. *Market. Co.* v. *Hoffman*, 101 U. S. 112, 115.

*Mr. Henry A. M. Smith* and *Mr. George S. Mower* for appellees.

Mr. Justice Harlan, after stating the case, delivered the opinion of the court.

The Coosaw Mining Company undoubtedly acquired by the act of 1870, and upon the conditions therein prescribed, the right, for the full term of twenty-one years, to dig, mine and remove phosphate rocks and phosphatic deposits in the navi- gable waters of South Carolina. But the right thus acquired was not made an exclusive one. The State was at liberty, so far as that act was concerned, to grant similar rights to other associations, corporations or persons. This is not disputed.

Did the appellant, by its acceptance of the act of 1876, ac-

quire an exclusive right with respect to that part of Coosaw River then occupied for the purposes of its business? If this question be answered in the affirmative — as, in view of the express language of the act, it must be — the State is, nevertheless, entitled to a decree, upon the issue as to the impairment of the obligation of the alleged contract, unless it be held that that act gave an exclusive right to the Coosaw Mining Company, *in perpetuity*, conditioned only upon its meeting the terms prescribed by the third section, namely, that it would make true and faithful returns of the number of tons of phosphate rock and phosphatic deposits dug, mined, removed, shipped or otherwise sent to market, and pay the royalty as provided for in the first section of that act. It cannot be denied that the third section, if it be construed literally and without reference to other sections or to the act of 1870, will bear this interpretation. But the act of 1876, if interpreted, as it ought to be, in connection with that of 1870, will, to say the least, bear equally another construction, namely, that the right granted by the original act for the term of twenty-one years, was made, by the act of 1876, exclusive, *only during the remainder of that term*, as to the part of Coosaw River occupied by the appellant's works, "so long as and no longer than" it made the returns and paid the royalty prescribed by the latter act. Under the latter construction, the right of the appellant, by the acts of 1870 and 1876, to dig, mine and remove phosphate rocks and phosphatic deposits in the navigable waters of the State, ceased altogether after the expiration of twenty-one years from March 1, 1870. If the act of 1876 materially altered that of 1870, in respect to the times and manner of making returns, or the royalty to be paid, the Coosaw Mining Company received in consideration therefor what it did not previously have, that is, an exclusive right, for a limited period, in the particular part of Coosaw River which it occupied when the act of 1876 was passed.

If the act of 1876 is fairly susceptible of either of the constructions we have indicated, as we think it is, the interpretation must be adopted which is most favorable to the State.

The doctrine is firmly established that only that which is
granted in clear and explicit terms passes by a grant of prop-
erty, franchises or privileges in which the government or the
public has an interest. *Rice* v. *Railroad Co.*, 1 Black, 358,
380; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 666; *Han-
nibal &c. Railroad* v. *Missouri River Packet Co.*, 125 U. S.
260, 271; *Central Transportation Co.* v. *Pullman's Car Co.*,
139 U. S. 24, 49; *Stein* v. *Bienville Water Supply Co.*, 141
U. S. 67, 80; *State* v. *Pacific Guano Co.*, 22 So. Car. 50, 83,
86. Statutory grants, of that character, are to be construed
strictly in favor of the public, and whatever is not unequivo-
cally granted is withheld; nothing passes by mere implica-
tion. *Holyoke Co.* v. *Lyman*, 15 Wall. 500; *The Binghamton
Bridge*, 3 Wall. 51, 75. This principle, it has been said, "is
a wise one, as it serves to defeat any purpose concealed by
the skilful use of terms to accomplish something not apparent
on the face of the act, and thus sanctions only open dealing
with legislative bodies." *Slidell* v. *Grandjean*, 111 U. S. 412,
438.

The wisdom of the rule adverted to is well illustrated by the
present case. Neither the title nor the preamble of the act of
1876 suggests the purpose on the part of the Coosaw Mining
Company, or of any other association or corporation, to obtain,
or the intention of the legislature to grant, a new right to dig,
mine and remove phosphate rocks and phosphatic deposits,
much less a grant of such a right in perpetuity. The title
discloses only a purpose to settle definitely the time for mak-
ing returns of rocks and deposits, so dug, mined and removed,
to establish the royalty to be paid, and to fix the terms on
which the act might be accepted by the parties named in it.
If the parties, so named, had in mind to acquire a grant for
an indefinite period, their purpose was concealed under the
general words in the title, "and also to fix the terms on which
this act may be accepted by the parties named therein."
Turning to the preamble, which has been said to be a key to
open the understanding of a statute, we find that the occasion
of the passage of the act of 1876 was a dispute between the
Coosaw Mining Company and the comptroller general of the

State, not as to the right of that company to dig, mine and remove phosphate rock and phosphatic deposits, but only as to the times and manner in which it should make its returns, and pay the prescribed royalty ; and that " for remedy thereof" the act was passed. Neither the title nor the preamble indicates a purpose to enlarge the right given by the act of 1870 for twenty-one years to one for an indefinite period. While express provisions in the body of an act cannot be controlled or restrained by the title or preamble, the latter may be referred to when ascertaining the meaning of a statute which is susceptible of different constructions. In *United States* v. *Fisher*, 2 Cranch, 358, 386, Chief Justice Marshall said : " Neither party contends that the title of an act can control plain words in the body of the statute ; and neither denies that, taken with other parts, it may assist in removing ambiguities. Where the intent is plain, nothing is left to construction. Where the mind labors to discover the design of the legislature it seizes everything from which aid can be derived ; and in such case the title claims a degree of notice, and will have its due share of consideration." *United States* v. *Palmer*, 3 Wheat. 610, 631. This rule is especially applicable in States whose constitutions, like that of South Carolina, provide that " every act or resolution, having the force of law, shall relate to but one subject, and that shall be expressed in the title." *Meyer* v. *Car Co.*, 102 U. S. 1, 11, 12. So, in *Beard* v. *Rowan*, 9 Pet. 301, 317 : " The preamble in the act may be resorted to, to aid in the construction of the enacting clause, when any ambiguity exists." The ambiguity here referred to is not simply that arising from the meaning of particular words, but such as may arise, in respect to the general scope and meaning of a statute, when all of its provisions are examined. Interpreting the act of 1876, with such aid as may be properly derived from its title and preamble, we are of opinion that the legislature did not intend to grant the appellant an exclusive right, for an indefinite period, but only an exclusive right, during the balance of the term of twenty-one years fixed by the act of 1870 ; and not even an exclusive right for that period except upon the performance of the conditions set

forth in the act of 1876 as to making returns and paying the prescribed royalty.

It results that the contention of the State must be sustained, whether we apply the rule requiring public grants to be favorably construed for the government, or whether, independently of that rule, we give effect to the intention of the legislature as disclosed by the words of the statute.

It is contended by the appellant that this case is not one of which a court of the United States, sitting in equity, could take cognizance. In meeting this question, the counsel for the State have placed some reliance upon the provisions in the act of 1890 authorizing the Board of Phosphate Commissioners, in the name and on behalf of the State, " to take such measures or proceedings, as they may be advised are proper, to enjoin and terminate " any molestation, interference or obstruction of the peaceable possession and occupation for mining purposes of the navigable streams of the State, either by the Board, or by any one licensed or authorized by it, and to take such action, for and in behalf of the State, as they deem proper for the protection of its interests. This statute is not important here except as showing the authority of that board to bring suits, in the name of or for the State, to protect its interests. The suit may have been cognizable in the state court, sitting in equity. But if it was not one of which the Circuit Court of the United States, sitting in equity, could properly take cognizance, (*Payne* v. *Hook*, 7 Wall. 425, 430; *Arrowsmith* v. *Gleason*, 129 U. S. 86, 98,) the pleadings, upon removal of the case from the state court, should have been reformed so as to make it a case to be tried at law. It is necessary, therefore, to inquire whether, according to the principles of equity, as recognized in the courts of the United States, the State can obtain relief by a suit in equity.

The grounds of equity jurisdiction in such cases as the one before us are, substantially, those upon which courts of equity interfere in cases of waste, public nuisance and purpresture.

The case of *United States* v. *Gear*, 3 How. 120, 121, 133, bears upon this question. The United States, claiming to be the owner of certain lands upon which there was a lead mine,

brought an action of trespass *quare clausum fregit* against the party in possession. They also brought a suit in equity for an injunction to stay waste. This court held, in the equity case, that digging ore from lead mines upon the public lands was such waste as entitled the United States to a writ of injunction to restrain it.

In *City of Georgetown* v. *Alexandria Canal Company*, 12 Pet. 91, 98, it was said to be "now settled that a court of equity may take jurisdiction in cases of public nuisance by an information filed by the attorney general . . . upon the principle that equity can give more adequate and complete relief than can be obtained at law."

In *Attorney General* v. *Richards*, 2 Anstr. 603, an information in equity in the name of the Attorney General, to restrain the erection of wharves and docks in a certain harbor, and to abate those erected, was sustained, the court observing that "where the King claims and proves a right to the soil, where a purpresture and nuisance have been committed, he may have a decree to abate it." In *Attorney General* v. *Forbes*, 2 My. & Cr. 123, 133, it was said by the Lord Chancellor that "in informations and proceedings for the purpose of preventing public nuisances, the ordinary course is for the Attorney General to take it on himself to sue as representing the public." In reply to the suggestion that an application to the High Court of Chancery to prevent a nuisance to a public road was never heard of before, he said: "Many cases might have been produced in which the court has interfered to prevent nuisances to public rivers and to public harbors; and the Court of Exchequer, as well as this court, acting as a court of equity, has a well established jurisdiction, upon a proceeding by way of information, to prevent nuisances to public harbors and public roads; and, in short, generally to prevent public nuisances." So in *Gibson* v. *Smith*, 2 Atk. 182, in which an injunction was sought to restrain a defendant from opening mines upon an estate held by him under a deed containing reservations against waste, and the opening of mines, and in which it was objected that the matter was not for the determination of a court of equity, Lord Chancellor Hard-

wicke said : "The plaintiff may certainly come into this court
to restrain the defendant from opening the mines, etc., even
if he has only threatened to do it; nor is it necessary the
plaintiff should have waited till the waste is actually com-
mitted, where the intention appears, and the defendant, even
by his answer, insists on his right to do it."

An instructive case upon this subject is *Attorney General* v.
*Jamaica Pond Aqueduct*, 133 Mass. 361, 363, 364. That was
an information in equity, in the name of the Attorney Gen-
eral, to restrain a corporation from doing certain illegal acts
the necessary effects of which would be not only to impair
the rights of the public in the use of one of the great ponds
of Massachusetts for purposes of fishing and boating, but to
create a nuisance by lowering the pond and exposing upon its
shores slime, mud and offensive vegetation detrimental to the
public health. It was held, upon the authority of numerous
cases, American and English, that where the nuisance is a
public one, an information by the Attorney General was the
appropriate remedy. After observing that the preventive
force of a decree in equity, restraining the illegal acts before
any mischief was done, would give a more efficacious and
complete remedy than an indictment, or proceedings under a
statute for the abatement of the nuisance, the court said :
"There is another ground upon which, in our opinion, this
information can be maintained, though perhaps it belongs to
the same general head of equity jurisdiction of restraining
and preventing nuisances. The great ponds of the Common-
wealth belong to the public, and, like the tidewaters and
navigable streams, are under the control and care of the Com-
monwealth. The rights of fishing, boating, bathing and other
like rights which pertain to the public are regarded as valu-
able rights, entitled to the protection of the government.
. . . . If a corporation or an individual is found to be doing
acts without right, the necessary effect of which is to destroy
or impair these rights and privileges, it furnishes a proper
case for an information by the Attorney General to restrain
and prevent the mischief." So, in Eden on Injunctions : "The
usual, and perhaps the more correct, mode of proceeding in

equity in cases of public nuisance is by information at the suit of the Attorney General," p. 267. Mr. Justice Story said that an information in equity at the suit of the Attorney General would lie in cases of purpresture and public nuisance, the jurisdiction of courts of equity being sustained because of " their ability to give a more complete and perfect remedy than is attainable at law, in order to prevent irreparable mischief, and also to suppress oppressive and vexatious litigations." Eq. Jur. §§ 922, 923, 924; *The People* v. *Vanderbilt*, 26 N. Y. 287, 293; *District Attorney* v. *Lynn & Boston Railroad Co.*, 16 Gray, 242, 245; Kerr on Injunctions, 262, 263; 1 Joyce on Injunctions, 120.

These principles are applicable to the present case. The remedy at law for the protection of the State in respect to the phosphate rocks and phosphatic deposits in the beds of its navigable waters is not so efficacious or complete as a perpetual injunction against interference with its rights by digging, mining and removing such rocks and deposits without its consent. The Coosaw Mining Company, unless restrained, will not only appropriate to its use property held in trust for the public, but will prevent the proper administration of that trust, for an indefinite period, by obstructing others, acting under lawful authority, from enjoying rights in respect to that property derived from the State. These conflicting claims cannot be so effectively or conclusively settled by proceedings at law, as by a comprehensive decree covering all the matters in controversy. Proceedings at law or by indictment can only reach past or present wrongs done by the appellant, and will not adequately protect the public interests in the future. What the public are entitled to have is security for all time against illegal interference with the control by the State of the digging, mining and removing of phosphate rock and phosphatic deposits in the bed of Coosaw River. Such security was properly given by the decree below.

*Decree affirmed.*