STATE et al. v. DAYTON LUMBER CO. et al.

(Court of Civil Appeals. Austin. Oct. 30, 1912. On Motion for Rehearing, Jan. 29, 1913. Rehearing Denied June 4, 1913.)

1. BOUNDARIES (§ 37*)—SURVEY—EVIDENCE.

In a suit to determine the location of certain boundaries, circumstantial evidence held to show that the surveyor who located a certain survey in controversy did not make an actual survey on the ground in whole or in part.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 184–194; Dec. Dig. § 37.*]

2. PUBLIC LANDS (§ 175*) — SURVEY — PRESUMPTION.

In the absence of evidence to the contrary, it will be presumed that a surveyor in locating an original survey of state land actually ran and established all the lines and corners as called for in his field notes, but this presumption may be rebutted.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. § 175.*]

3. BOUNDARIES (§ 10*) — SURVEY — FIELD NOTES—CALLS.

Where the evidence showed that certain surveys of state land were not actually run on the ground, calls in the field notes, other than calls for courses and distances from the corners on the bank of a river called for, could not be located and relied on for the determination of the boundaries of the surveys.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 90, 91; Dec. Dig. § 10.*]

4. EVIDENCE (§ 121*) — BOUNDARIES — FIELD NOTES OF SURVEY — RES GESTÆ — AT THE "SAME TIME."

Field notes of surveys made at the same time by the same surveyor are admissible as res gestæ, and the term "at the same time" does not necessarily mean on the same day, but that the work has been continuous from day to day or connected as a part of the series of surveys, though the work may have continued for many days, weeks, or months.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 303, 307–338, 1117, 1119; Dec. Dig. § 121.*

For other definitions, see Words and Phrases, vol. 7, p. 6326.]

5. EVIDENCE (§ 318*) — HEARSAY — FIELD NOTES OF SURVEYOR.

Field notes of a subsequent surveyor wherein he calls for the lines or corners of prior surveys amount only to a declaration that he found such lines or corners at the places indicated by his calls, and are hearsay, unless it appears that the surveyor was acting in an official capacity, and is dead when the evidence is offered.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1193–1200; Dec. Dig. § 318.*]

6. BOUNDARIES (§ 36*) — SURVEYS — SUBSEQUENT SURVEYS—FIELD NOTES.

Field notes of surveys made from 20 to 58 years after the original surveys were located by surveyors not shown to have had any knowledge of the location of the original lines or corners are inadmissible to show by their calls for the original surveys, the location of the lines and corners thereof.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 160–162, 164, 166–176; Dec. Dig. § 36.*]

7. BOUNDARIES (§ 35*)—LOCATION OF LINES AND CORNERS—REPUTATION.

Reputation as to the location of lines and corners of original surveys beginning some 40 years after the surveys were located, and which appears to have originated from a survey made by a surveyor not shown to have had any knowledge as to the location of the surveys, is inadmissible.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 153–155, 157–159, 163, 165, 177–183; Dec. Dig. § 35.*]

On Motion for Rehearing.

8. PUBLIC LANDS (§ 173*)—LANDS OF STATE—SCHOOL LANDS—ACTIONS—STATUTES—"INTEREST"—"THEREFOR."

Acts 26th Leg. (1st Ex. Sess.) c. 11, § 8 (Rev. Civ. St. 1911, art. 5468), entitled "An act to define the permanent school fund of the state, to partition public lands between that fund and the state, and to adjust the account, and providing for suits in T. county against any person claiming any of the lands belonging to the school fund, or any other funds," declares that the Attorney General may bring suit "therefor" in that county, when the state or school fund has an "interest" in the land in question. Held, that the word "interest" as so used meant an interest which would entitle the state to recover the land; the word "therefor" meaning "for the land," and hence, where the state had sold the land in controversy on credit and the sale was in good standing, the fact that the land had not been paid for did not authorize the state to sue nor confer jurisdiction on the court of T. county to act with reference to land located in another county.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 581–587; Dec. Dig. § 173.*

For other definitions, see Words and Phrases, vol. 4, pp. 3696–3702; vol. 8, pp. 6950, 6951, 7691.]

Error to District Court, Travis County; Geo. Calhoun, Judge.

Action by the State and others against the Dayton Lumber Company and others. Judgment for defendants, and plaintiffs bring error. Reversed on rehearing, with directions to transfer the cause to Liberty county.

See, also, 155 S. W. 1178.

Jewel P. Lightfoot, Atty. Gen., John L. Terrell, Asst. Atty. Gen., L. B. Moody and L. R. Bryan, both of Houston, and N. A. Rector, of Austin, for appellants. Gregory, Batts & Brooks, of Austin, Stevens & Stevens, of Liberty, and A. D. Stone, of Belton, for appellees.

Findings of Fact.

JENKINS, J. This suit was brought upon the theory that the land covered by the Shattuc surveys at the date of the location of said surveys (August, 1904) had not been appropriated by prior surveys, and therefore belonged to the school fund. There is no controversy as to the location of the lines and corners of said Shattuc surveys. Said surveys call to be bounded on the east by the Jose Martinez surveys Nos. 6 and 9, and on the west by the I & G. N. surveys Nos. 38 and 39. There is no controversy as to the location of the lines and corners of said I. & G. N. surveys, they being fixed by a call for a corner of the James Dowell survey, which is found and identified on the ground by its bearings; and also by their calls for the east line of the Thos. Newman league, the location of

which is not called in question. The Shattuc surveys do not conflict with the I. & G. N. surveys as thus located; they do not conflict with the Martinez surveys, as those surveys are claimed by appellants to be located, but do conflict with and are entirely covered by said Martinez surveys as the same are claimed by appellees to be located. So the issue in this case is as to the true location of the western boundary lines of said Martinez surveys.

The Martinez surveys were located in 1833, and their field notes are as follows:

"No. 6. League No. six is situated on the western side of the Trinity river adjoining in the middle of the river with the S. W. corner of a league occupied by a colonist named Phillip Miller, commencing from a laurel, 12 in. dia. upon the margin of the river, from which there is an ash, 14 inches in diameter, south 4½ varas, and a cottonwood 30 inches in diameter to the N. 82 deg. W. 17 varas, which is the first corner; from thence to the west 10,609 vrs. to a stake, from whence there is a magnolia 8 inches in diameter to the N. 59 deg. E. 14½ vrs., and a gum 2 inches in diameter to the N. 24' 30" 11 vrs., which is the second corner. From thence to the south 2500 varas to two very small trees, from whence there is a mulberry 5 inches in diameter to the N. 46 deg. 30' E. 8½ vrs. and a white oak 12 inches in diameter to the north 70 deg. W. 2 vrs. which is the third corner. From there to the east 9895 varas to a stake on the margin of the above mentioned river, which is the fourth and last corner, and from there following the turns of the same river upwards until arriving at the point of commencing, league No. 6 was completed."

"No. 9. League No. 9 is on the western side of the Trinity river, in front of the league occupied by Phillip Miller, commencing from an ash tree 18 inches in diameter on the margin of the same river, from which there is a gum tree 15 inches in diameter to the S. 30 deg. W. 9½ varas, and an ash 8 inches in diameter to the north 16 deg. 30' W. 13½ vrs., first corner. From there to the west 10,088 vrs. to a white oak 6 inches in diameter, from which there is a red oak 24 inches in diameter to the N. 35 deg. 30' W. 13 vrs.; and a white oak 10 inches in dia. to the south 27 deg. 30 E. 9¾ varas, which is the second corner. From there to the south 2500 vrs. to two small oaks 3 inches in diameter, from whence there is a pine 8 inches in diameter to the S. 47 deg. E. 11¾ vrs. and a black oak 6 inches in diameter to the N. 44 deg. W., 7 vrs., which is the third corner. From thence to the east 9246 varas to the first corner of league No. 6, which is the fourth and last corner of this league. And from there following the turns of the river upwards until arriving at the point of commencing, league number nine was completed."

It will be observed that the field notes of

these surveys do not give the meanders of the river. The meanders on the east boundary of No. 9 are shown by the record as appears in the sketch next below. A map accompanying the title issued to Martinez in 1833 shows the river to be as indicated by the dotted lines on said sketch.

The following sketch and explanation of the same show the location of surveys Nos. 9 and 6 according to the two theories advanced in this case:

If survey No. 6 be begun opposite the southwest corner of the Phillip Miller league, and survey No. 9 begun opposite the northwest corner of said Miller survey, as called for in their field notes and contended for by appellees, and run out according to their calls for course and distance, the corners of said surveys will be as indicated by circles (thus O) on said sketch. If survey No. 6 be begun on the west side of Horseshoe Lake, and run west and south the distances called for in its field notes, making reasonable allowance for error in measurement, and thence east to the river, and survey No. 9 be begun at the same point, and run west and north the distances called for in their field notes, making reasonable allowance for errors in measurement, and thence east to the river, such being the contention of the appellees, the corners of surveys Nos. 6 and 9 will be as indicated by crosses (thus X) on said sketch.

The Shattuc surveys are bounded on the west by the I. & G. N. surveys, on the north by the Coy survey, on the south by the James Dowell, the Williamson and the B. B. B. & C. R. R. survey, and their east

lines are coincident with the west lines of Nos. 6 and 9 as the same are claimed to be located by appellants, but are included in said surveys 6 and 9, as the same are claimed to be located by appellees. Said sketch also shows the Trinity river, Horseshoe Lake, two other lakes on the north line of No. 9, Davis bayou, Gaylor's Lake, Gaylor's creek, and Gross bayou, as found on the ground. None of these objects are called for in the field notes of the Martinez surveys Nos. 6 and 9. The lakes on the north line of No. 9 are one 70 and the other 79 varas wide, waist deep and impassible for horses; Davis bayou is from 10 to 30 varas wide, and about waist deep; Gaylor's Lake is about 1½ miles long, 85 varas wide, and very deep. Gaylor's creek is described by witnesses as a large creek. None of the bearing trees called for in the field notes of either survey No. 6 or No. 9 can be found, and no line of either of said surveys can be identified by any tree marked when such surveys were made. If the upper and lower lines of the Phillip Miller survey be extended to the west bank of the Trinity river, they will reach the point claimed by appellants for the northeast corner of survey No. 9, and the common corner of Nos. 9 and 6; and, if the south line of said Miller survey be extended, it will reach the point on the west bank of Horseshoe Lake claimed by appellees to be such common corner. If the common line between Nos. 6 and 9 be extended west from the common corner of said surveys, as the same is claimed to be located by appellees, it will reach Horseshoe Lake at 1,078 varas, and will run in said lake for a distance of 1,725 varas, making the west bank of said lake 2,303 varas west of the west bank of the river. Horseshoe Lake was probably once the bed of Trinity river, and might now be mistaken for such by one who did not know that it was not, as shown by the testimony of surveyors for appellants and for appellees.

## Opinion.

1. As stated in the foregoing findings of fact, the location of surveys Nos. 6 and 9 cannot be determined by any marked trees for either corners or lines. Looking to the field notes of said surveys, we find that survey No. 9 is described as being in front of the league occupied by Phillip Miller. Its lower corner is the same as the upper corner of No. 6, which is described as being "adjoining in the middle of the river with the southwest corner of a league occupied by a colonist named Phillip Miller." As both the Phillip Miller survey and the Martinez No. 9 were leagues that were required by law to be of the same width fronting on the river, it would appear from this description that by the words "in front of the league occupied by Phillip Miller" would mean that the lines of the Phillip Miller, if extended across the

river the distance called for in the field notes of No. 9, would trace the upper and lower lines of said survey No. 9. The above statement of facts assumes that these corners of the Phillip Miller survey are known. There is nothing in the record to indicate that there has ever been any dispute as to the location of such corners; the lines of said survey are plainly marked, and there is a fence on the south line of said survey. The original bearing trees of the Phillip Miller survey cannot now be found, but there can be no question as to its true location, from the fact that this survey called for the meanders of the river, and, as shown by the record, it fits such meanders as it is now located. Such is the variety in the natural course of streams that perhaps no other place on the Trinity river could be found which would answer to the description of the meanders given in the Phillip Miller field notes. Survey No. 9, if it be run from the corners of the Phillip Miller course and distance, as called for in its field notes, will be located as claimed by appellees. Appellants insist that the call for the Phillip Miller should be disregarded for the alleged reason that said survey was not made until 1835 two years after the Martinez surveys were located. They are not borne out in this contention by the record. There is, in the record a certified copy from the Land Office of the field notes of the Phillip Miller survey. Underneath these field notes is written "May 13th, 1835, S. C. Hirams." There is no statement in connection with these field notes that they were made in 1835, nor when they were made; nor is there any explanation of what is meant by May 13, 1835, nor any statement nor explanation as to who S. C. Hirams was. It does not appear that he was the surveyor who made this survey. These field notes may have been filed in the Land Office by Hirams at that date, but the indorsement "May 13th, 1835, S. C. Hirams," is not proof that these field notes were made by Hirams nor any one else at that date. On the other hand, there is strong evidence in the field notes of Nos. 6 and 9 that the Phillip Miller survey had been made prior to the making of these surveys, otherwise the surveyor making them could not have known that he was beginning survey No. 6 at the southwest corner of the Phillip Miller league, as he declares in said field notes that he did.

It is contended by appellees that the surveyor who located No. 9 did not begin on the bank of the Trinity river opposite the northwest corner of the Miller survey, for the reason that to so begin said survey, and run it west as called for in its field notes, it would cross the Trinity river twice, and no such call is made in said field notes. We think this can be accounted for by the fact that the surveyor who located said survey No. 9 never in fact ran the north line of said survey; and for reasons hereinafter set forth we think it probable that he never ran any of the

lines of either survey No. 9 or No. 6. We think that the surveyor located upon the ground the northeast corner of No. 9, and the common corner between Nos. 9 and 6.

[1] Appellees argue, as we think with much force, that neither the north line of No. 9 nor the south line of No. 6 were run by the surveyor who made such locations. We quote from appellees' brief upon this point as follows: "It is perfectly clear in this case that the surveyor who located the two Martinez leagues did not run all their lines. * * * The fact that he called for no bearing trees on the river at the southeast corner of No. 6, though he was in a heavily wooded country; the fact that in running it he would have passed through Gaylor's Lake (it being a deep lake as wide as the Trinity river, about 85 varas wide and a mile and a half long) and did not call for it, the fact that he would have crossed a large creek seven times and did not call for it, and would have crossed a bayou four times and did not call for it, all these things clearly indicate that the south line of No. 6 was not actually run upon the ground." Speaking of the north line of No. 9, appellees say: "It is clearly evident that the surveyor who made this location * * * called to run east (from the northwest corner of No. 9) without actually running the distance. * * * It is perfectly clear that if the south line of No. 9 ran to the river, as it now is, it was a longer line than the north line of No. 9, which would be in direct conflict with the field notes of No. 9, which makes the north line 10,088 varas and the south line 9,246 vrs." This is upon the assumption that the north line of No. 9 running east from its northwest corner stops upon the west bank of the river where it first reaches the same. "As additional proof that the surveyor did not run the north line of No. 9, the court's attention is called to the fact that in doing so he would have crossed one large creek and two lakes in running the distance called for in the field notes, whereas he calls for no such creeks or lakes."

2. It is the contention of appellees that the surveyor established the common corner of Nos. 6 and 9 on the west bank of Horseshoe Lake, mistaking the same for the river, and that he ran thence west the distance called for in the field notes of No. 9; and thence north 2,500 varas, and returning to the southwest corner of No. 9, extended the line of No. 6 west the remainder of the distance called for that line, and thence ran south 2,500 varas "the rest of the work being paper work." With these contentions as to the failure to run the north line of No. 9 and the south line of No. 6 we agree. We also think that the common line between said surveys was never run for the following reasons: As above stated, beginning at said common corner, opposite the southwest corner of the Philip Miller survey, and running thence west as called for in the field notes of No. 6,

Horseshoe Lake would have been entered at about half a mile, and the line would have run in said lake for about that distance, and Davis bayou would have been crossed three times. No mention is made of these objects in the field notes. Even assuming that the surveyor mistook Horseshoe Lake for the Trinity river, and began upon the west bank of said lake and ran west as called for in his field notes, still he would have crossed Davis bayou three times. His field notes did not call for this stream.

[2] It has been frequently stated, and correctly so, that, in the absence of proof to the contrary, the presumption will be indulged that the surveyor actually ran and established all of the lines and corners of the survey as called for in his field notes. This upon the general proposition that officers are presumed to have done their duty; but we know from experience that this presumption does not always hold true, and especially so as to surveyors actually running the lines and establishing the corners as called for in their field notes. Bacon v. State, 2 Tex. Civ. App. 708, 21 S. W. 152. Such a presumption is a very proper one to be indulged in the absence of evidence to the contrary, but it is to be indulged in the absence of evidence and not against it. The evidence against such presumption need not be positive. In many cases the circumstances are so strong as to entirely overcome such presumption, and we think such is the case in reference to these surveys, basing our conclusion upon the facts above stated. There is nothing in the record to rebut the presumption that the surveyor actually located upon the ground the northeast corner of No. 9 and the common corner of Nos. 9 and 6. If he did so, and did no other work on the ground, but constructed the other lines and corners of said survey by protraction, then the location of said surveys must be determined by the courses and distances called for in the field notes; there being no calls for the lines or corners of any other surveys and no calls for bearing trees which can now be found.

There is an additional reason for presuming that the surveyor did not run the north line of survey No. 9 in this: Accompanying his field notes is a sketch of No. 9 which shows that immediately below the northeast corner of said survey the river bends far to the east, as shown by the dotted lines on the sketch hereinabove set out, whereas in fact it bends far to the west. Had it bent to the east, as the surveyor supposed it did, his line running west would not have crossed the river as in fact it is found to do, which fact he would have discovered had he actually ran said line.

The meanders of the river on surveys Nos. 9 and 6 are not given, but the length of the upper and lower lines of No. 9 shows where the river should be with reference to the termini of said lines; that is, it shows that the river at the northeast corner of No. 9 is 842

varas east and 2,500 varas north of said river at the southeast corner of said survey. The evidence in this case shows that these corners are so located with reference to each other. As said with reference to the meanders of the Phillip Miller survey, it would be difficult to find any other place on the Trinity river where the outgoing and returning lines of survey No. 9 would reach the river at the distances called for in the field notes of said survey. The relative location of the northeast and southeast corners of survey No. 9 could have been ascertained by beginning at the northwest corner of the Phillip Miller survey, and running thence south 2,500 varas to the south line of same, and thence west to the river.

3. As above stated, it is appellees' contention that the surveyor who located the Martinez surveys made the common corner of said surveys upon the west bank of Horseshoe Lake, either for the reason that the same was at that time the channel of the Trinity river, or said surveyor mistook the same for said river. This presupposes that he did not find and identify the southeast corner of the Phillip Miller survey. If he did so, he would not have made said common corner on the west bank of Horseshoe Lake, even though, in fact, it may have been the Trinity river at that time, for in so doing he would not have located said common corner "adjoining in the middle of the river with the southwest corner of the league occupied by a colonist named Phillip Miller," but would have located the same more than a mile west of said corner. If he did not find and identify the southwest corner of the Phillip Miller survey, the inquiry naturally arises: How did it happen that he located a corner on the west bank of Horseshoe Lake more than a mile distant and exactly west of said Phillip Miller corner, and on a continuation of said line to the west of the river? Again, the field notes of No. 9 show that its northeast corner is 842 varas east of its southeast corner. If the southeast corner of No. 9 be located upon the west bank of Horseshoe Lake, and it be run thence west 9,246 varas and north 2,500 varas, and thence east to the west bank of the river opposite the northwest corner of the Miller league, the northeast corner of No. 9 will be located 3,145 varas east of its southeast corner; and if said northwest corner of No. 9 be located upon the west bank of the river, where said line would first reach the river, it will still be east of its southeast corner 1,875 varas, instead of 842 varas, as called for in its field notes. These facts, together with the fact that if the southeast corner of No. 9 be located at the southwest corner of the Phillip Miller, and the northeast corner of No. 9 be located at the northwest corner of the Phillip Miller, said corners will occupy their correct relative positions as indicated in the field notes, are to our minds conclusive evidence that the surveyor did not begin upon the west bank of Horseshoe Lake. On the contrary, by the facts above set forth, we are convinced that the common corner of surveys Nos. 6 and 9 was not located upon the west bank of Horseshoe Lake, but that said corner was located on the west bank of the Trinity river, as it now runs, opposite the northwest and southwest corners of the Phillip Miller league.

[3] 4. Appellees contend that their theory as to the proper construction of surveys Nos. 6 and 9 is supported by the fact that the James Dowell survey calls to corner with the southwest corner of survey No. 6, and that the W. K. and W. L. Williamson surveys and the B. B. B. & C. R. R. survey calls to be located upon the south line of said survey No. 6, and that the I. & G. N. Railway surveys Nos. 38 and 39 and the Brownrig survey, an abandoned survey which formerly covered the same ground now covered by I. & G. N. surveys Nos. 38 and 39, called for the west line of said surveys Nos. 9 and 6. Appellants objected to the introduction of the field notes of these surveys upon the ground that the lines and corners of the senior survey could not be established by the calls in the field notes of junior surveys. These objections should have been sustained. The James Dowell survey was made in 1853, 20 years after surveys Nos. 6 and 9 were located. The B. B. B. and C. Railway survey was located in 1860; the Williamson surveys were located in 1895; the Brownrig survey was located in 1860; and the I. & G. N. surveys were located in 1875.

[4] The field notes of surveys made at the same time by the same surveyor are admissible as part of the res gestæ. "At the same time" does not mean on the same day, but that the work was continuous from day to day, and connected as a part of the series of surveys, though such work may have continued for many days, or even weeks and months.

[5] But the field notes made by a subsequent surveyor, wherein he calls for the lines or corners of prior surveys, amount to no more than a declaration by him that he found such lines or corners at the places indicated by his calls. Such declarations are hearsay, and cannot be put in evidence, unless it be shown, not only that the surveyor was acting in his official capacity, but that he is dead at the time such evidence is offered. The party against whom such evidence is offered ought to have the privilege of cross-examining the witness, and ascertaining from him how he found and located such lines or corners. The testimony of such surveyor may furnish very strong evidence that the lines and corners of the senior surveys are located as called for in his field notes. On the other hand, a cross-examination may show that he located such lines and corners on a false theory, or upon mere-

supposition or hearsay, and that his evidence is entitled to no weight as to such location. As illustrative of this, let us suppose that the surveyor who located the Dowell survey 20 years after the Martinez surveys were made was upon the stand and a cross-examination should show that he located the southwest corner of survey No. 6 by beginning the same upon the west bank of Horseshoe Lake, and running course and distance west and south for the southwest corner of said survey No. 6. This would have brought him to about where he located the corner of the Dowell survey, and called for the same to be the southwest corner of survey No. 6. But if it should be made to appear, and we think such is the fact, that the northeast corner of No. 6 is not on the west bank of Horseshoe Lake, then it will be seen that he called for the southwest corner of said survey No. 6 upon a mistake of fact as to the true location of said corner. We think that the fact that the other junior surveys called for surveys Nos. 6 and 9 to be located about as appellees contend they are is to be accounted for from the fact that these junior surveys tie onto the Dowell survey, and adopted the calls in said survey as to the location of the west line of surveys Nos. 6 and 9.

5. Appellees also contend that their theory as to the true locations of surveys Nos. 6 and 9 is supported by the calls in a deed from Jas. M. Lewis and wife to M. M. Bingham and Geo. W. Bradford for 1,000 acres of land, and from Bradford and wife to said Bingham for their interest in said tract. These deeds were made in 1875. The deed from Lewis and wife contains no intelligible description of any land. Its calls are as follows: "All that tract or parcel of land being situated in Liberty County, State of Texas, and out of a large grant of land made by the Mexican Government to Jose Dolores Martinez in the year 1833, and to be surveyed so as to commence at the north corner of league granted to William Hardin in said county [the number of the Martinez league is not given, and there is nothing in the record to show the location of said Hardin league] commencing at the north corner of said league, and running west on the outer or back line of said league 1,640 varas, more or less; thence east on the dividing line of said league 375 varas, more or less; thence south 1,640 varas, more or less; thence north 375 varas more or less to the place of beginning, to be surveyed out of the north corner as to contain 1,000 acres in a square or as near as possible, taking and keeping the outer or back line as the base or main line of this tract of 1,000 acres as aforesaid."

[6] It will thus be seen that the survey begins at the north corner of a league location, unknown so far as this record shows, and runs west 1,640 varas and east back over the same line 375 varas; thence south 1,640 varas, and thence north over the same line 375 varas, describing the same as a square "as near as possible." The deed from Bradford and wife describes the land conveyed as being a part of the Martinez league, surveyed by James Winter, county surveyor, on the 7th and 8th days of December, 1876. Beginning at the southwest corner of the upper Martinez league, and then describes a parallelogram, the north and south lines of which are 2,258 varas running east and west, and the east and west lines are 2,500 varas in length, running north 30 east and south 30 west. If the outer or west line of this tract conforms to the west line of survey No. 9, then said line runs south 30 west, instead of south, as called for in the field notes. How the surveyor arrived at the conclusion that this was the proper way to locate the west end of survey No. 9 we are at a loss to determine. Appellants objected to the introduction of this deed, and this objection should have been sustained for the reason that the calls in the field notes were hearsay, irrelevant, and immaterial to the issue in this case.

[7] 6. Appellants further contend that they have shown the location of the west lines of surveys Nos. 6 and 9 by general reputation from the testimony of Mr. Lum. The testimony of this witness as to reputation goes no further back than in the early 70's and the lines and corners about which he testifies were evidently lines and corners of the 1,000-acre tract, the location of which, by reputation or otherwise, does not tend to establish the true location of surveys Nos. 6 and 9.

7. We will briefly restate our conclusions of law applicable to the facts of this case as embodied above in this opinion.

(1) In the absence of evidence to the contrary, it will be presumed that the surveyor actually made the survey on the ground as described in his field notes. Stafford v. King, 30 Tex. 269, 94 Am. Dec. 304; Gerald v. Freeman, 68 Tex. 204, 4 S. W. 257; Phillips v. Ayres, 45 Tex. 605.

(2) That the surveyor did not make an actual survey on the ground, in whole or in part, may be shown by circumstantial evidence. Jones v. Burgett, 46 Tex. 292; Phillips v. Ayres, supra.

(3) The evidence in this case is not sufficient to show that the surveyor who located the Martinez surveys did not find the northwest and southwest corners of the Phillip Miller survey and establish the northeast corner of No. 9 and the common corner of Nos. 9 and 6 with reference to said Miller corners, as stated in his field notes.

(4) The circumstantial evidence in this case is very strong that none of the lines of the Martinez surveys were actually run upon the ground.

(5) If said surveys were not actually run upon the ground, then there is no call in their field notes by which they can be located, except the calls for courses and distances from their corners on the west bank of the river.

(6) If said surveys were actually made upon the ground to the extent of making the northwest and southwest corners of said surveys, then inasmuch as the objects called for in the field notes to identify said corners cannot now be found, and there is no one who pretends to know where such corners were actually made, there is no evidence in the record, except course and distance from their river front corners, by which said surveys can be located.

(7) The field notes of surveys made from 20 to 58 years after the Martinez surveys were located by surveyors who are not shown to have had any knowledge as to location of the lines or corners of said Martinez surveys are not admissible for the purpose of showing by their calls for said Martinez surveys the location of the lines and corners of same. Mill Co. v. Lumber Co., 96 S. W. 68; Goodson v. Fitzgerald, 40 Tex. Civ. App. 619, 90 S. W. 901.

(8) Reputation as to the location of the lines and corners of the Martinez surveys beginning some 40 years after said surveys were located, and which appears to have originated from a survey made by a surveyor who is not shown to have had any knowledge as to the location of said surveys, is not admissible.

(9) If the field notes of the prior surveys above referred to had been admissible in evidence, they are not of sufficient weight to overcome the presumption that the surveyor who located the Martinez surveys made the corners of same on the west bank of the river adjoining the Phillip Miller survey, as stated in his field notes, and either actually surveyed the lines or projected them from said corners the courses and distances called for in his field notes.

8. The trial court correctly held that it had jurisdiction of this cause. The land in controversy was sold by the state for $2,009.50; and, should it have been held that said land was included within prior surveys, the school fund would have been loser to that amount. Besides this, title to the land is still in the school fund, and will continue to be until the full purchase price is paid, and the patents issued, for which reason the state is interested in the result of this suit, and it was properly brought in Travis county. Section 8, Acts of 1900, p. 29, article 5468, Rev. Stat. 1911.

Believing, for the reasons hereinbefore given that the trial court erred in rendering judgment for appellees, the judgment of said court is here reversed and judgment is rendered for the appellants, and the lines and corners of the Jose Martinez survey No. 6 are here established as follows: Beginning at a point on the west bank of the Trinity river *opposite the Phillip Miller league;* thence west 10,609 varas; thence south 2,500 varas; thence east to the west bank of the Trinity river; thence up said river with its meanders to the place of beginning.

And the lines and corners of the Jose Martinez survey No. 9 are here established as follows: Beginning at a point on the west bank of the Trinity river opposite the northwest corner of the Phillip Miller league, thence west 10,088 varas; thence south 2,500 varas to the north line of survey No. 6; thence east 9,246 varas to the northeast corner of said survey No. 6 on the west bank of the Trinity river; thence up said river with its meanders to the place of beginning.

Reversed and rendered.

### On Motion for Rehearing.

The field notes of the Martinez survey No. 6 call to begin at the southeast corner of a league "occupied by a colonist named Phillip Miller." It is a reasonable presumption, in the absence of evidence to the contrary, that his official survey, whenever made, ran to this corner; hence it is immaterial whether the official field notes of the Miller league copied in the statement of facts herein were made before or after the Martinez surveys were located. In the original brief herein the location of the Miller corners was not called in question by either side. Assuming that these corners were identified, there being no better evidence as to the location of the Martinez surveys, the proper method of locating them would be to protract the north and south lines of the Miller survey to points on the opposite bank of the river for the upper corner of No. 9, and the common corners of Nos. 9 and 6, and from such corners run out said surveys, courses, and distances as called for in their field notes, and we so held in the original opinion herein.

On the original submission of this case, our attention was not called to any evidence which we thought was sufficient to rebut this theory. On the contrary, it was strongly supported by a map filed by plaintiffs in error, as a part of their argument, the correctness of which was not then questioned by defendants in error, and which was adopted by us, as appears from our findings of fact herein. This map showed the river at the northwest corner of the Miller survey to run south, so that an extension of the north line of the Miller survey would place the northeast corner of No. 9 immediately across the river from the northwest corner of said Miller. On the supposition that the north line of said survey No. 9 was not actually run, as both parties to this suit assert, and as we believe to be true, it is immaterial that the extension of said line west would cross the river. The only effect of this would be that said survey No. 9 would lose the land included within its boundaries lying east of the river.

The map above referred to further showed that the Trinity river was platted thereon from the 20 meander calls of the Miller survey, and that the river was so found on

the ground. On motion for rehearing, defendants in error show by a plat of the calls for the meanders of the river in the Miller field notes, that said map is not correct, and counsel for plaintiffs in error admit this to be true. For reasons not necessary to state, the mistake in said map does not reflect upon the integrity of the attorneys for plaintiffs in error, and counsel for defendant in error do not charge that it does, but the fact remains that we were misled thereby. The calls for the meanders in the Miller field notes show that, instead of said river running south at the northwest corner of the Miller survey, it runs nearly west and then turns north, west, and south, so that an extension of the north line of the Miller west from its northwest corner would not cross the river until it reached the point designated on said map as "N. E. Corner No. 9, as defendants contend." From this it will be seen that to locate said survey No. 9 "in front of the Miller survey," as called for in its field notes—that is, to place it exactly opposite the Miller survey so that its north line will be an extension of the north line of the Miller—its northwest corner would be as claimed by defendants in error. There is, however, no satisfactory evidence as to the location of either corner of the Martinez No. 6. Instead of the southwest corner of the Miller being as indicated on said map, its calls for the meanders of the river would place it 981 varas further west, which would be near the east bank of the Horseshoe Lake.

[8] We have reached the conclusion that we were in error in holding that the district court of Travis county had jurisdiction to try this case. If venue was properly laid in Travis county, it was by virtue of Acts 1900, p. 29, the eighth section of which appears in the Revised Statutes of 1911 as article 5468. Said article authorizes the Attorney General to bring suit when the state or school fund has an interest in the land, and we held that, inasmuch as the state had sold this land upon a credit, the school fund had an interest therein. Upon further consideration, we are of the opinion that the "interest" mentioned in said article must be such interest as would entitle the state to recover the land. A subsequent portion of said article says that the Attorney General shall bring suit "therefor," which we construe to mean for the land. The state having sold the land in controversy, and said sale being in good standing, it was not authorized to recover the land. The fact that the land had not been paid for would not give it such right. Stephens v. Motl, 82 Tex. 81, 18 S. W. 99; Carey v. Starr, 93 Tex. 514, 56 S. W. 324.

If said article admits of a different construction, the title of the act should be looked to in aid of its construction. Mining Co. v. South Carolina, 144 U. S. 550, 12 Sup. Ct.

689, 36 L. Ed. 537. Reference to the title of said act discloses the fact that the only mention of bringing suits in said caption is in the following language: "And providing for suit in Travis county against any person claiming any of the lands belonging to the school fund or any other funds." The lands in controversy do not belong to the school fund, nor to any other fund. The purpose of said act, as thus expressed in its caption, confirms the construction that the Attorney General is authorized to bring suit in Travis county only in such cases as the state is authorized to recover the land.

For the reasons above set out, we are of the opinion that this case should be reversed with instructions to the district court of Travis county to transfer the same to Liberty county, and it is so ordered.