MADDOX et al. v. DAYTON LUMBER CO. et al. (No. 12.) *

(Court of Civil Appeals of Texas. Beaumont. Jan. 7, 1916. Motion for Rehearing Feb. 25, 1916. Motion to Reform Judgment April 20, 1916. On Rehearing, Oct. 19, 1916.)

1. BOUNDARIES ☞3(6) — DETERMINATION — SURVEYS.
In determining the boundaries of conflicting surveys, the footsteps of the surveyor are the determining factor, and where they are found and identified as called for in the field notes, they must control.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 24–29; Dec. Dig. ☞3(6).]

2. BOUNDARIES ☞3(6)—DESCRIPTION—CONFLICTING ELEMENTS.
Where the line traced by a surveyor can be fixed by reference to meander calls of a river which has since changed its course, the contention that the call of a subsequent survey must be determined by the present course of the river, cannot be sustained.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 24–29; Dec. Dig. ☞3(6).]

3. BOUNDARIES ☞10—DESCRIPTION—INACCURACY IN SURVEY.
That the meander calls of a survey do not balance, in that they do not close by a distance of 114 varas is not important in determining the sufficiency of the survey to fix the location of a boundary.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 90, 91; Dec. Dig. ☞10.]

4. BOUNDARIES ☞11—DESCRIPTION—REFERENCE TO FORMER SURVEY.
Where the field notes of a survey do not give the meanders of a river on the east line, but the west line of an older survey on the east side of the river give such meanders, the meanders given in the older survey control the later survey.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 92–94; Dec. Dig. ☞11.]

5. BOUNDARIES ☞37(3)—EVIDENCE—SUFFICIENCY.
Evidence held to show that none of the original witness or bearing trees called for in field notes of a survey can be located on the ground.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 186–191; Dec. Dig. ☞37(3).]

6. BOUNDARIES ☞37(3)—EVIDENCE—SUFFICIENCY.
Evidence held to show that the lines of a survey were never run on the ground by the surveyor.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 186–191; Dec. Dig. ☞37(3).]

7. BOUNDARIES ☞35(2)—EVIDENCE—ADMISSIBILITY—GENERAL REPUTATION.
Testimony that witness knew a corner of a survey, that he had never heard it mentioned but once, that people did not talk land matters then as the land was not worth anything, and which does not indicate when the reputation was with reference to the time of placing the existing lines on the ground, is inadmissible.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 154, 155; Dec. Dig. ☞35(2).]

8. BOUNDARIES ☞35(2)—EVIDENCE—ADMISSIBILITY—GENERAL REPUTATION.
Evidence of common reputation of the location of a boundary must be general, concurrent, and certain as to the subject-matter, and must be reputation, and not individual assertion.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 154, 155; Dec. Dig. ☞35(2).]

9. BOUNDARIES ☞36(5)—EVIDENCE—ADMISSIBILITY—GENERAL REPUTATION.
To establish general reputation as to the location of lines and corners of a survey, surveys made 20 and 42 years later, which called for bearing trees not mentioned in the field notes of the original survey, are inadmissible.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 171–176; Dec. Dig. ☞36(5).]

10. BOUNDARIES ☞36(5)—EVIDENCE—ADMISSIBILITY.
In an action involving the boundaries of a survey, junior surveys were admissible to show their general location on the ground.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 171–176; Dec. Dig. ☞36(5).]

11. TRIAL ☞234(1)—INSTRUCTIONS—LIMITING PURPOSE OF EVIDENCE.
Where junior surveys were admissible to show their general location on the ground, but not to establish by reputation the location of lines and the corners of a senior survey, instructions that the junior surveys were to be considered by the jury for all purposes except they should not consider the bald declaration as to the location of the line, were sufficient to limit the legitimate purpose of the evidence.
[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 534, 566; Dec. Dig. ☞234(1).]

12. BOUNDARIES ☞10—DESCRIPTION—REFERENCE TO FORMER SURVEY.
Field notes of the survey on the west side of the river describing a survey as being in front of a league previously surveyed on the east side of the river mean that the lines of the older survey if extended across the river would trace the upper and lower lines of the new survey.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 90, 91; Dec. Dig. ☞10.]

On Rehearing.

13. APPEAL AND ERROR ☞176—PRESENTING QUESTION IN TRIAL COURT—ISSUES AND PROOFS.
Where it was agreed in the trial court that the plaintiffs were the owners of a junior sur-

---

vey and that the defendants were the owners of senior surveys and that plaintiffs were entitled to recover to the extent that the surveys were not in conflict the defendants cannot assert on appeal that the junior survey was absolutely void for the reason that the deputy county surveyor who located them was acting for himself.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1066; Dec. Dig. ⟨⟩176.]

Appeal from District Court, Liberty County; J. Llewellyn, Judge.

Action by M. D. Maddox and others against the Dayton Lumber Company and others. From a judgment for defendants, plaintiffs appeal. Modified and affirmed.

L. B. Moody, of Houston, and N. A. Rector, of Austin, for appellants. Stevens & Stevens, of Liberty, for appellees.

CONLEY, C. J. This was a suit by Mrs. M. D. Maddox, as plaintiff, Mrs. Mary E. McDonald, executrix of the estate of R. McDonald, deceased, as intervener, and the defendant Arch McDonald, against the Dayton Lumber Company, Mrs. Kate Brashear, James E. Ferguson, Julian Kelton, Genevieve Kelton, Mary White, and her husband, W. B. White, to recover title and possession to, and remove cloud from, the title to 1,778.7 acres of land described as Shattuc surveys 62, 63, and 64 in Liberty county, Tex.; and also to establish the true boundary lines existing between the said Shattuc surveys and the Martinez leagues 6 and 9 on the east, and between the Shattuc surveys and I. & G. N. surveys 38 and 39 on the west.

The suit was originally instituted in the summer of 1910 in the district court of Travis county. In a trial to the court without the intervention of a jury, judgment was rendered for the appellees. The case was appealed to the Court of Civil Appeals for the Third Supreme Judicial District, and that court first reversed and rendered the case. State v. Dayton Lumber Co., 159 S. W. 391. Upon a motion for rehearing, the case was certified to the Supreme Court on a question of venue, and that court, sustaining the contention of appellees, who had filed a cross-assignment of error, held that the venue of this cause was in Liberty county. State et al. v. Dayton Lumber Co., 106 Tex. 41, 155 S. W. 1178. The case was then reversed and remanded and subsequently transferred to the special district court of Liberty county. It was tried by that court without a jury, and judgment again rendered for the appellees.

Briefly stated, the essential facts of the case are as follows:

Martinez leagues 6 and 9 were titled in 1833 to Jose Dolores Martinez. The original field notes of each, as filed in the General Land Office, are as follows:

"League No. 9 is on the west side of Trinity river and in front of the league occupied by Philip Miller; commencing on an ash tree 18 inches in diameter on the margin of the same river from which there is a gum tree 15 inches in diameter to the south 30 degrees west 9½ varas and an ash 8 inches in diameter to the north 16 degrees 30 minutes west, 13½ varas, which is the first corner; from there to the west 10,088 varas, to a white oak 6 inches in diameter, from which there is a red oak 24 inches in diameter, to the north 35 degrees 30 minutes west, 13 varas, and a white oak 10 inches in diameter to the south 27 degrees and 30 minutes east, ¾ varas, which is the second corner; from there to the south 2,500 varas to 2 small oak trees 3 inches in diameter, from whence there is a pine 8 inches in diameter to the south 47 degrees, 11¾ varas, and a black oak of 6 inches in diameter to the north 44 degrees west, 7 varas, which is the third corner; from there to the east 9,246 varas, unto the first corner of league No. 6, which is the fourth and last of this league, and from there following the turns of the river upward until arriving at the point of commencing, league No. 9 was completed.

"League No. 6 is situated on the western side of Trinity river, adjoining in the middle of the river with the southwest corner of a league occupied by a colonist named Philip Miller, commencing from a laurel 12 inches in diameter upon the margin of the river, from which there is an ash tree 14 inches in diameter to the south 4½ varas, and a cottonwood 30 inches in diameter to the north 82 degrees west, 17 varas, which is the first corner; from there to the west 10,609 varas to a stake from whence there is a magnolia 8 inches in diameter to the north 59 east, 14½ varas, and a gum 2 inches in diameter to the north 24 degrees 30 minutes west, 11 varas, which is the second corner; from there south 2,500 varas to 2 very small trees, from whence there is a mulberry 5 inches in diameter, to the north 46 degrees 30 minutes east, 8½ varas, and a white oak 12 inches in diameter to the north 70 degrees west, 2 varas, which is the third corner; from there to the east 9,895 varas to a stake upon the margin of the above-mentioned river, which is the fourth and last corner, and from there following the turns of the river upward until arriving at the point of commencing, league No. 6 is completed."

The Miller league referred to in the Martinez field notes was surveyed prior to the location of the Martinez grants. While it is true the field notes of the Miller league have written at the bottom of them "May 13, 1835, S. C. Hirams," yet, still we cannot accede to the contention of appellants, that the call for the Philip Miller league should be disregarded, for the alleged reason that said survey was not made until 1835, two years after the Martinez surveys were located. We adopt the view of the Court of Civil Appeals of the Third District on this question. That court said (Id., 159 S. W. 393):

"There is no statement in connection with these field notes that they were made in 1835, nor when they were made; nor is there any explanation of what is meant by May 13, 1835, nor any statement nor explanation as to who S. C. Hirams was. It does not appear that he was the surveyor who made the survey. These field notes may have been filed in the land office by Hirams at that date, but the indorsement 'May 13, 1835, S. C. Hirams,' is not proof that these field notes were made by Hirams nor any one else at that date. On the other hand, there is strong evidence in the field notes of Nos. 6 and 9 that the Philip Miller survey had been made prior to the making of these surveys, otherwise the surveyor making them could not have known that he was beginning survey No. 6 at the southwest corner of the Philip Miller league, as he declares in said field notes that he did."

The original field notes of the Philip Miller league are as follows:

"Field notes of the league of land surveyed for Philip Miller on the east bank of the Trinity: Beginning at the northwest corner of the league of land surveyed for Peter Blanchette, a water oak 8 inches in diameter, from which a water oak 15 inches in diameter bears south 49° 30$^1$ W., 9.5 varas dist., also a white oak 18 in. dia. brs. N. 53° 30′ E., 14 vrs. dist.; thence with the meanders of the river up as follows: N. 82° E., 300 varas; N. 22° E., 278 varas; N. 33½° W., 290 varas; N. 12° W., 200 vrs.; N. 39° E., 310 vrs.; N. 48° E., 350 varas; N. 73° E., 290 vrs.; N. 45° W. 310 vrs., 150 varas; S. 48° E., 430 varas; N. 77° E., 270 varas; N. 48° E., 210 varas; N. 36° E., 210 varas; N. 47° E., 310 varas; N. 51° W., 300 varas; S. 71° W., 300 varas; S. 59° W., 390 varas; N. 87° W., 330 varas; north 210 varas; N. 20° E., 450 varas; N. 32° W., 200 varas; N. 67° E., 320 varas; S. 72° E., 100 varas; S. 65° E., 200 varas; S. 53° E., 130 varas; S. 55° E., 300 varas; N. 84° E., 170 vrs., to a box elder 10 in. dia., from which a cotton tree 48 in. dia. brs. N. 55° E., 18 vrs. dist., also a box elder 12 in. dia. brs. S. 71° E., 9 varas dist., also a box elder 12 in. dia. brs. S. 71° E., 9 varas dist., oak, cottonwood, ash, and hickory timber, undergrowth, cane, land rice, but subject to overflow; thence east 3,420 varas, trace leading from Liberty to Nacogdoches 8,881.3, mound, 3d corner, from which a white oak 24 inches in dia. brs. S. 23° W., 15 varas dist., also a magnolia 11 in. dia. brs. S. 70½° W., 12. 7 vrs. dist., oak, ash, and pine timber, undergrowth, dogwood, cane, and myrtle, land fertile; thence south 2,500 varas, white oak 8 in. dia., 4th corner, from which a pine 18 in. dia. brs. N. 60° E., 14 varas dist., also a water oak 14 in. dia. bears S. 1° E., 10.7 varas dist, pin oak and ash timber, undergrowth, cane, myrtle, and palmetto, land sterile; thence west 10,754 varas to the place of beginning—containing one league, of about 6 labors of farming and the balance pasture land. May 13, 1835. S. C. Hirams."

I. & G. N. surveys 38 and 39 were located in 1875, and there is no controversy as to the location on the ground of these two surveys, they being tied to a corner of the James Dowell survey, which corner is found and identified on the ground by its bearings, the latter survey having been made in 1853. The east line of the two I. & G. N. surveys and the west line of the two Martinez surveys 6 and 9 are called for in the field notes of the two I. & G. N. surveys as the common boundary line between them.

In 1904 a deputy surveyor of Liberty county named Jones, acting on the assumption that he had discovered a vacancy between the west lines of I. & G. N. surveys 38 and 39 surveyed and located the Shattuc surveys 62, 63, and 64, placing them in the alleged vacant area between said surveys, and plats and field notes of said Shattuc surveys were filed in the General Land Office, and thereupon the land included therein was held to be "scrap land" by the state and put on the market for sale. Both the land and the timber were thereafter sold by the state, and the plaintiff, intervener and defendant, McDonald (all of said parties being hereinafter referred to as appellants) through mesne conveyances are now the owners of the land in the Shattuc surveys, subject, however, to the

fulfillment of the obligations in the purchase contract from the state. The field notes of the Shattuc surveys are as follows:

### "Survey No. 62.

"State of Texas, Liberty County.

"Field notes of a survey of 640 acres made for R. W. Shattuc by virtue of his affidavit, and application made before Ralph C. Eubanks, notary public, on the 5th day of July, 1904, and filed on the 5th, with the surveyor of Liberty county, on the 5th day of July, 1904, under an act of first called session of the Twenty-Sixth Legislature, approved February 23, 1900, and as amended by an act approved April 15, 1901, providing for the sale of unsurveyed lands, said land is situated in Liberty county, Texas, about 18 miles N. W. of Liberty and known as survey No. 62.

"Beginning 450 varas S. 1° E. from N. W. corner of league No. 9 J. D. Martinez, at a stake the intersection of said line with the south line of the M. De Los Santos Coy 4 league grant; thence S. 1° E., 1577.6 vrs., with old mkd. line said J. D. Martinez, to a stake from which stake a white oak brs. S. 21½° W. 9.8 to a pin oak 8 brs. N. 77° W. 16.5 vrs.; thence S. 89° W., 2293 vrs., to a stake in east line survey 38 I. & G. N. survey, post oak 5 in. dia. brs. S. 7½° E. 8.8 pin oak S. 72° E. 10.1 vrs.; thence N. 1° W. 1,577.6 vrs. with east line said No. 38 I. & G. N. to a stake in south line said Santos Coy 4 leagues; thence N. 89° E., 2,293 varas, to the beginning. Bearings marked X. Surveyed Aug. 9th, 1904. Variation 7° 30′ east.

"Geo. W. Mize,
"Lewis Urnsworth, Chainmen.

"I, W. S. Jones, special deputy surveyor of Liberty county, Texas, do hereby certify that the foregoing survey was made by me on the ground according to law, that the limits, boundaries, and corners with the marks, natural and artificial, are truly described in the foregoing plat and field notes, just as I found them on the ground. W. S. Jones, Special Deputy Surveyor Liberty Co. Texas.

"I hereby certify that I have examined the above field notes and find them correct, and that they are recorded in Book F, page 359, Surveyor's Record, Liberty Co., Texas. August 30, 1904. Ralph C. Eubank, County Surveyor, Liberty County, Texas."

### "Survey No. 63.

"State of Texas, Liberty County.

"Field notes of a survey of 640 acres of land made for R. W. Shattuc by virtue of his application and affidavit, made before Ralph C. Eubank, notary public, on this the 5th day of July, 1904, and filed with the county surveyor of Liberty county on the 5th day of July, 1904, under an act of first called session of the Twenty-Sixth Legislature, approved February 23, 1900, and as amended by an act approved April 15, 1901, providing for the sale of unsurveyed school land, said land is situated in Liberty county, Texas, about 18 miles N. W. of Liberty and known as survey No. 63.

"Beginning the west line of the J. D. Martinez No. 9 at a stake the S. E. corner of survey No. 62, white oak brs. S. 21½° W. 9.8 pin oak 8 in. 77 W. 16.5 vrs.; thence with No. 9 Martinez west line S. 1° E. 472.4 vrs. to original cor. said Martinez No. 9, a stake pine now 36 in. dia. brs. S. 47° E., 11¾ vrs., black oak 24 N. 34° W. 7; thence S. 89° west, with north line of J. D. Martinez No. 6, 1,363 varas, to N. W. cor. of same, a stake pine 10 S. 86° W., 1.8 do. 13 N. 393.8 vrs.; thence S. 8° E., with west line of J. D. Martinez No. 6, 400 vrs., cross a gully at 1,150 vrs., cor. stake double pin oak S. 77° W. 6.2 a gum 12 S. 14° E., 7.6; thence S. 89° W.

2,200 to a stake in east line No. 39 I. & G. N. Sur.; thence N. 1° W. 1,150½ vrs. to an E. cor. said No. 39, stake black gum N. 5¾° W., 9.4 a sweet gum S. 57° E., 2 vrs.; thence N. 89° W., 1,270 varas, S. E. cor. Sec. 39 I. & G. N. Sur., a stake pine brs. N. 73° W. 10.2 vrs., pine 18 brs. S. 75° E. 6.2 vrs.; thence N. 1° W., at 322 vrs. cross a gully C, S. E., at 334 pass a cor. for said 38 and 39 at 472 vrs., cor. stake post oak 5 S. 7½° E. 8.8 vrs. pin oak 6 S. 72½° E. 10.1 vrs.; thence N. 89° E. 2,293 vrs. to the beginning.  Surveyed August 10, 1904.  Bearings marked X.

"Geo. W. Mize,

"Lewis Urnsworth, Chainmen.

"I hereby certify that I have examined the above field notes and find them correct and they are recorded in Book J, page 361, of Surveyor's Record, Liberty Co., Texas, September 30, 1904. Ralph Eubank, County Surveyor, Liberty Co. Texas."

"Survey No. 64.

"State of Texas, Liberty County.

"Field notes of a survey of 498.7 acres of land made for R. W. Shattuc by virtue of his application, and affidavit made before Ralph C. Eubank, a notary public, on the 5th day of July, 1904, and filed with the county surveyor of Liberty county, Texas, on the 5th day of July, under an act of first called session of the Twenty-Sixth Legislature, approved February 23, 1900, and as amended by an act approved April 15, 1901, providing for the sale of unsurveyed school land.  Said land is situated in Liberty county, Texas, about 18 miles N. W. of Liberty and known as survey No. 64.

"Beginning at the S. E. corner of No. 63 on the west line of J. D. Martinez league No. 6 at a stake, double pin oak brs. S. 77° W. 6.2 gum 12 in. S. 14° E. 7.6; thence S. 1° E., at 769½ vrs. Gaylor's creek, at 1,279½ to a stake in north line of B. B. B. & C. Ry. Sur. a gum 6 in. N. 24½° E. 1.6, a do. 8 in. S. 33° W. 5.4; thence S. 89° W., with north line said B. B. B. & C. Ry. Sur., plainly marked, 1,370 N. W. cor. of said Sur., continuing in same marked line crossing Gaylor's creek at 2,200 east lines James Dowell sur. a stake 70 vrs. N. 1° W. from the L corner of said Dowell; thence N. 1° W., at 122 the N. E. corner of James Dowell, run old square post of pine white oak old bearings white oak brs. N. 88° W. 6.2 a do., S. 85½° W. 8.8, continuing same course in old line of No. 30 at 1,-279½ vrs. a stake; thence N. 89° E. 2,200 to the beginning.  Surveyed Aug. 11, 1904.  Bearings mkd. X.  Variation 7° 30', east.

"George W. Mize,

"Lewis Urnsworth, Chainmen.

"I, W. S. Jones, special deputy surveyor of Liberty county, Texas, do hereby certify that the foregoing survey was made by me on the ground, according to law, that the limits, boundaries, and corners, with the marks, natural and artificial, are truly described in the foregoing plat and field notes just as I found them on the ground. W. S. Jones, Special Deputy Surveyor, Liberty Co. Texas."

The appellees assert title to all of the land and timber in controversy, claiming that the same did not belong to the state at the time it was sold, because all of said land was either at said dates a part of the Jose Dolores Martinez leagues 6 and 9, or that they were a part of the I. & G. N. surveys 38 and 39, and for that reason there was no vacant land to be located by or on behalf of said Shattuc surveys, and none to be sold by the state of Texas.

It was agreed among the parties that I. & G. N. surveys 38 and 39 and Martinez grants

188 S.W.—61

6 and 9 are older surveys than the Shattuc surveys, and that the latter surveys, to the extent (if at all) that they are not in conflict with said older surveys, are owned by the appellants, and they are entitled to recover to such extent; but if said Shattuc surveys are in conflict with said older surveys, either in whole or in part, the appellees are the owners and entitled to recover all, or so much thereof as may be in conflict with said older surveys.  This agreement, therefore, eliminates any question of title as to said surveys in the several parties, and the case was considered and tried by the court below, as it should have been, as one of boundary only.

The court submitted this cause to the jury upon special issues, and asked them three questions, two of which are as follows:

First: "Are the western lines of the Martinez grants 6 and 9, as originally located, common lines with the eastern lines of the Shattuc surveys, as described in plaintiff's petition?  Answer this yes or no."  This question the jury answered, "No."

Second: "Are the western lines of the Martinez grants, as originally located, common lines with the eastern lines of the I. & G. N. surveys?  Answer yes or no."  This question the jury answered, "Yes."

Upon this verdict the court entered judgment, fixing the boundaries of the two Martinez grants, so as to include all the land constituting the Shattuc surveys, and from this judgment appellants duly perfected an appeal.

Appellants' eighth, ninth, eighteenth, and twentieth assignments of error attack the court's charge and the verdict of the jury, because, as they assert, there was no evidence in the case upon which an affirmative answer could be given to question No. 2, and because all of the testimony in the case was insufficient for the jury to locate Martinez 6 and 9 at any place, and because the verdict is unsupported by the evidence.  These assignments all relate to the same subject-matter, and will be treated together.

The real and pivotal controversy between the parties to this suit arises over the true location of the beginning of the northeast corner of No. 9 and the beginning or northeast corner of No. 6, Martinez grants, as called for in their field notes.  And inasmuch as the solution of these problems depends upon the true location of the Philip Miller league, it is of first importance to determine the location of the western boundary line of the Philip Miller.

The evidence is undisputed that the north and south lines of the Miller league are marked and identified by bearing trees on the ground, although the northwest and southwest corners cannot now be located on the ground.  The evidence, however, shows that the marks of this league on the line trees found on the ground were put there in

1833. These facts justify the conclusion that the lines of the Miller league were actually surveyed on the ground in 1833.

It appears from the field notes that the western boundary line of the Miller grant calls for the Trinity river and gives the meanders of that river in variations, degrees, and minutes, in its extension from the inner northwest corner to the southwest corner of said league.

The present location of the river, with its meanders, as it flows across the north and south lines of the Miller, does not now fit the meander calls for the river made in 1833, when the Miller west line was surveyed. The Trinity river is now at a point on the south line of the Miller, 1,039.77 varas east from where it calls to be in the original field notes at the southwest corner; in other words, if the field notes for the west line of the Miller be ignored, and the southwest corner located according to its call on the Trinity river where it now is, it will be 1,039.77 varas east of where it was when the survey was made in 1833.

It is the contention of appellants that the southwest corner of the Miller must be placed at the intersection of the south line of said league with the river as it is now located, and in projecting the south line of Martinez grant No. 9, the distance of 9,246 varas must be measured, they assert, from that point. On the other hand, it is contended by appellees that the course of the river has changed since the original survey of the Miller in 1833, and that what is now known as "Horseshoe Lake" on the south line of Martinez No. 9, was then part of the Trinity river, and that in measuring the distance for the south line call of said league, it must be projected from a point on the west side or bank of said lake; that point, at the time the survey was made, being, as they assert, the west side of the river as called for in the field notes.

There was much evidence introduced upon this subject. Some of the surveyors testified that they found the bed of an old river, that it is now a slough, that it is plainly visible on the ground, that its meanders practically fit the meander calls for the river made in the Miller field notes in 1833, and that said old river bed or channel was contiguous with and included Horseshoe Lake. We have carefully examined the evidence in the record on this issue, and find that there is just and ample warrant for the conclusion that the channel of the river has changed since 1833, and that the Miller field notes, giving the meanders of the river, correctly located the channel of the river at that time, and that Horseshoe Lake was therefore then a part of the channel of said river. The following maps are made a part of this opinion, and reference is hereby made to the same for elucidation of the points at issue and the conclusions of the court:

I ran and measured all lines on this plat, marked in solid red lines.

I was with F. M. Maddox when he ran and measured the 5 line of Martinez No. 6, marked in broken red pencil lines.

My actual work on the ground, determined the length of North and South lines of Martinez No. 9, from Shattuc East lines to the Trinity River. Marked in double broken red pencil lines.

(Signed)　Jno. W. Maddox

The red lines referred to in certificate of John W. Maddox are indicated in this plat by the heavy black lines.

It is to be observed that the west line calls of the Miller field notes places all of the land *east* of the river in the Miller grant, and that the river forms a part of the north, as well as the west boundary line of said survey—winding around the west and a part of the north sides of said grant; also that a line projected due west from the most easterly intersection of the Trinity river with the well-marked north line of the Miller grant, as found on the ground, extends a distance of 1,270 varas before it would again meet the furthermost west bank of said river, and all of the land adjacent to said line until it strikes the bank of said river is included, according to the field notes, in the Miller grant.

It is contended by appellants that the northwest corner of the Miller is at a point where the north line of the Miller, as now found on the ground, first intersects the Trinity river from the east. While on the other hand, appellees contend, and the trial court impliedly found in fixing the northeast corner of Martinez No. 9 as it did, that the northwest corner of the Miller, as it affects the beginning, or the northeast corner of Martinez No. 9, was at a point 1,270 varas further west from the point contended for by appellants, as such northwest corner of the Miller.

[1] It is a cardinal principle of law that in determining the boundaries of conflicting surveys, that the footsteps of the surveyor are the determining factor, and where such footsteps as called for in the field notes are found and identified they must control. Taft v. Ward, 58 Tex. Civ. App. 259, 124 S. W. 437; Byrd v. Langbein, 135 S. W. 206.

[2] The footsteps of the surveyor can be traced in fixing the boundaries of the Philip Miller, and the west line of that survey must therefore be constructed according to its field notes, and in accordance with the meander calls of the Trinity river. To accept the contention of appellants in placing the northwest corner of the Miller at the point they claim it should be would ignore the principle herein announced, and do actual violence, besides, to the field notes of that survey, as it would exclude territory which, beyond all doubt, is included in the Miller field notes.

[3] The fact that the meander calls of the Philip Miller do not now balance—that is, that they do not close by an excess of westings of 114 varas in reaching the south line in running the same from the northwest to the southwest corner—is of no material importance. Such discrepancies are not unusual in making long-distance surveys. According to the testimony of one experienced surveyor, it was his observation that when an old survey has more than four sides, it cannot be made to close, especially along a river bank. The discrepancy is due, according to the testimony of such experienced surveyor, to the difference in accuracy in

measuring with a chain or a tapeline. The chain always runs excessive to the tapeline measurement. These meanders, together with the old north and south well-marked lines of the Miller, are sufficient to support the conclusion of the court in placing the western and a part of the northern boundaries of the Miller as herein determined.

[4] The field notes of the Martinez No. 9 do not give the meanders of the river on its east line. But the east line of Martinez No. 9 and the west line of the Philip Miller being common lines, and the Miller being the older survey, the meanders of the Trinity river, as specifically given in the latter survey, will control the contour of the Martinez east line.

[5] The record is practically conclusive that none of the original witness or bearing trees called for in the field notes of Martinez No. 6 or 9 can now be located on the ground. The witness Jones, who located the Shattuc surveys, reported in his field notes, and also testified on the trial of the cause, that he located the witness trees at the northwest corner of Martinez No. 9, and also at the southwest corner of Martinez No. 9 *at the places he contends said corners should be.*

Every other witness, including surveyors who checked the work of the witness Jones, witnesses both for the appellants and appellees say that they could find no such original bearing trees as Jones said he found, and again, on cross-examination, the witness Jones admitted that he made the Shattuc surveys and located the vacancy for himself. He says:

"When I found out there was a vacancy in there, I got a man to settle on it, and apply for it. I did not get the land myself. * * * I was to get my part of it, of course. Jett was to get all of the land; he and I together and Shattuc was to get 160 acres. I was acting as deputy surveyor at the time. * * * I know that under the law a surveyor cannot become interested in any lands that is located, but I don't know any in the state that hasn't got land in that way. I know that it is against the law, but we do lots of things against the law."

If the witness trees be located at the points claimed by the surveyor, Jones, and the north and south lines of Martinez No. 9 be allowed their full distance calls, there will necessarily be a conflict between the boundaries of the Philip Miller and the said Martinez. This evidence is so inconsistent and totally at odds with all of the other testimony in the record that we feel justified in ignoring it, as was done by the trial court and jury.

[6] We do not believe that the lines of Martinez 6 and 9 were ever run on the ground by the original surveyors; and the presumption that they were actually run, in our opinion, is overcome by the following evidence: (1) The field notes of neither one of said grants designates any sort of an identification mark on the witness trees placed at the corners of said grant. (2) No object called for in the field notes has ever been identified, except the Trinity river, in front of

the Miller league. (3) The actual meanders of the Philip Miller places the river in a radically different position from that shown by the original plat of Martinez No. 9 filed in the General Land Office by the surveyor. (4) No original corners, bearing trees, line, or line trees of 6 or 9 have ever been identified, or located anywhere at any time. This is a most singular situation, since all of the lines of the two Martinez grants 6 and 9 run through a deeply forested country, and the north and south lines are from 4 to 5 miles in length. (5) The field notes of 6 and 9 both show that the surveyor did not meander the river. The calls therein for the river are: "Following the turns of the river upward." (6) Except the Trinity river, no natural object is called for, although the south line of No. 6 crosses Gaylor's creek within 86 varas of the "L" corner of the Dowell, crosses Gaylor's creek seven times on the north line of the William Williams, and on the north boundary line of the Claiborne Holshousen crosses a deep lake 75 to 160 varas wide, and also crosses two creeks 9 varas wide before reaching the river. (7) The common lines of 6 and 9 cross Davis bayou 30 varas wide three times. (8) The north line of Martinez No. 9 crosses a pond 150 varas wide, two boggy lakes 70 and 79 varas wide, waist deep, and impassable for horses, and then crosses Davis bayou 30 varas wide, and still no natural object except the Trinity river is anywhere mentioned in either of the two Martinez grants, or shown on the original plat filed by the surveyor in the General Land Office.

[7] It is the contention of appellees that they have established the northwest corner of No. 9 and the northwest and southwest corners of No. 6 at the places it is contended by them such corners should be, by general reputation, and they base such claim upon the testimony of their witness Lumm, and upon the field note calls of the junior surveys for the Martinez lines, introduced in evidence. The witness Lumm testified upon direct examination in substance as follows:

"I know where the northwest corner of league No. 6 is; it is east of Thicket creek on what is called the old Cherry Bear trail. It is what is called the Martinez corner. I know where they have surveyed these Shattuc surveys. I know where they are situated on the ground. I helped Jones run them off, and when he run them off, and it takes the west end of No. 6 in, takes the corner of No. 6 and also takes in the corner of No. 9, too. I don't know where the northwest corner of No. 9 is, but I do know where the southwest corner of No. 9 is. There is a house there now, right in the corner. The house belongs to the Dayton Lumber Company, I guess; they had it built. I don't know anything about the common reputation of that corner in 1870. In 1875 a storm went through that country and the timber was all torn down and people did not go through there much. The corner of No. 6, which was recognized as the northwest corner of No. 6, is in the line where the Shattuc surveys now run; the west line of the Shattuc runs through it. I don't know what the common repute was as to where the east line of I. & G. N. survey was. I know they came

to what is called the west line of the Martinez. I only know that by hearing it. The only common reputation I know about is the northwest corner of No. 6, and there are some trees there."

On cross-examination he said:

"The nearest neighbor to the place I designate as the northwest corner of No. 6 is old man Cherry, out on the prairie from there about a mile and a half or two miles west of that corner, and old man Smith lives out there about the same distance from it. My father-in-law lived south of it on the prairie. He was about a mile and a half or maybe two miles from it. Nobody lived north of it for a long ways. That was all timber, and nobody lives in there yet either. I don't know any reason why there should be any common reputation as to that corner; don't know what would have caused any discussion about the corner. When I say general reputation I mean by that everybody is talking about it. That corner was in the woods, and there were very few people that ever went into those woods; not many people there to go in there; just those people that lived out there on the prairie two or three miles away. This corner was over in the timber in dense woods. I have heard people say that was the corner of No. 6. I heard my father-in-law; we were hunting a bunch of hogs once, and he went up one side of the creek, and my brother-in-law and me went up the other, and he told us if we didn't find the hogs to meet at the Martinez corner on the Cherry Bear trail. That was the first time I ever heard anything about it, but I don't know just where it was. I don't know whether I heard anybody else say anything about it. *They didn't talk land matters then. It wasn't worth anything, and they didn't pay any attention to it. That is the only person I ever heard say anything about it.*"

Inasmuch as appellants' assignments of error 1 to 6 attack the admissibility of such evidence, it may be appropriate to here consider the rules governing the admissibility of evidence of this character.

In the evolution of practice and procedure through the long grind of the centuries, the character of the jury changed from one which had personal knowledge before the trial of the matters in controversy, or which acquired information through its own initiative by conversing with the neighbors who were thought to have knowledge of such matters, to one which knew nothing about the issues in controversy, or whose mind was free from opinions on questions about to be submitted for its determination, and whose source of information must be confined exclusively to the narration of facts by witnesses called to testify in their presence in open court. Under the latter conditions the rules of evidence, as we understand them today, had their origin. Cross-examination was soon recognized as such a vital test of the accuracy of statements that the courts eventually came to the adoption of the hearsay rule. However, one of the several exceptions to that doctrine allows the introduction of general reputation, which in its nature is still a traditional resort in a modified sense, to common repute as a source of knowledge.

This exception to the hearsay rule is based upon the principle of *necessity* and the principle of *circumstantial guaranty of trust-*

*worthiness.* As applied to boundary cases, the *necessity* is to be found in the general dearth of other satisfactory evidence of the desired facts, the matter usually being an ancient one, and no living witnesses found; and the *circumstances creating a guaranty of trustworthiness* are found when the topic is such that the facts are likely to have been generally inquired about, and of sufficient importance to have become the subject of neighborhood discussion, and discussed by persons having personal knowledge of the facts involved, and thus, it is presumed, that the community's conclusion, if it has been so founded, is likely to be worthy of belief and trustworthy in character.

In discussing this kind of evidence, Justice Coke, in the case of Stroud v. Springfield, 28 Tex. 668, says:

"The admission of evidence of common reputation as to old boundaries, which frequently cannot possibly be proved by direct and positive testimony, is based on the extreme probability of the truth of a fact received, assented to, and acted on as true by the common consent of a community having peculiar means for correct information, and no interest to warp their judgment in forming a conclusion. In the absence of direct and positive testimony which, when they are ancient, cannot usually be had to establish boundaries, common reputation is perhaps as little liable to error as any other species of evidence that can be resorted to for the purpose, and, indeed, is frequently the only resort. The general rule is undoubted, that common reputation is admissible as evidence in questions of boundary, but there is much diversity of opinion as to its proper application. The unrestricted admission of this species of evidence would be fraught with the most dangerous tendencies, and violative of the best dictates of experience. The admissibility, as well as the value and weight, of general reputation must, from its nature, depend very much upon the circumstances of the case in which it is offered. It cannot, of course, be received as to title. It is admissible only as to the locus in quo of the boundary; a fact of which the community or neighborhood around it is supposed to be peculiarly well informed. The boundary must be an ancient one, and its supposed locality must be of sufficient interest and note in the neighborhood or community to have been the subject of observation and conversation among the people. * * * There, weight of opinion or neighborhood report is not common reputation. The reputation or understanding must have been formed and in existence before the controversy commenced in which it is used as evidence. Men are not presumed to be indifferent in regard to matters in actual controversy, for when the contest has begun, people generally take one side or the other, and, if they are disposed to speak the truth, facts are or may be seen by them through a false medium. * * * For this reason it is necessary that proof of common reputation must have reference to a time ante litem motam. The question propounded to the witness Copps ('whether or not the location of the Powell league as represented on the map had been uniformly and generally regarded and accredited as the true location by the community around it'), is general, and not limited even to the filing of the suit. It is not limited to any particular time. * * * The court ruled upon the question as propounded, and the ruling is correct. Hearsay evidence is generally inadmissible. Desiring to introduce evidence under an exception to that general rule, it devolved upon the appellant to bring himself within the limits of the exception, which he failed to do."

[8] Evidence of this character must be general, concurrent, and certain as to the subject-matter. Matthews v. Thatcher, 33 Tex. Civ. App. 133, 76 S. W. 64. It must be reputation, and not individual assertion. Wigmore on Evidence, § 1584; Russell v. Hunnicutt, 70 Tex. 660, 8 S. W. 500.

An analysis of the witness Lumm's testimony shows that it does not, at least, comply with two of the requisites hereinabove stated, viz.: First: It was not general in its character. The cross-examination shows that the conversation with his father-in-law in the woods was the first and only time he ever heard the matter mentioned, and that he never heard anybody else say anything about it. That "people didn't talk land matters then, as the land was not worth anything, and they didn't pay any attention to it." Second: It is not certain as to the subject-matter, and therefore lacks the element of trustworthiness required by the rule, in that he did not know where the corner was to which his father-in-law referred, and he frankly admits that he cannot say whether the reputation was before or after 1875. (It being conceded by all of the parties that the corners and lines now found on the ground of the Martinez grants were put there in that year.) In our opinion, this evidence was not admissible, or, if admitted, it is of such a flimsy character as to wholly lack sufficient force to overcome the other controverting facts on this issue, and we hardly feel justified in establishing it as a precedent for the location of boundary lines, or corners, so as to overcome the dignity of a call for distance.

[9] The field notes of the junior surveys introduced in evidence by appellees, wherein calls are made for the lines and corners of the Martinez surveys, cannot be used to establish general reputation that the lines and corners of the latter surveys were at the places appellees contend for, for the reason that they, too, lack the element of trustworthiness essential to that kind of evidence, and are not concurrent with the date of the Martinez grants. It is not shown that such surveyors making the junior surveys had knowledge of the actual location of the Martinez surveys. The evidence in question does not come within the rule announced in the case of Reeves v. Roberts, 62 Tex. 552, where the surveyor making the declaration was shown to have actually seen the old marked corner, and to have found the monument at the disputed point, and have used such point on numerous occasions to make other surveys.

The Dowell survey was made 20 years after the Martinez surveys, and calls for the bearing trees as being at the southwest corner of Martinez No. 6, which do not correspond to either the size, mark, or direction of any of the trees contained in the Mar-

tinez field notes and designated by such field notes as being in that corner. The decisions of our courts have settled the proposition that lines and boundaries cannot be construed with reference to objects that may be found upon the ground, as indicating the footsteps of the surveyor, when there are no calls in the grant for such objects. Railway Co. v. Anderson, 36 Tex. Civ. App. 121, 81 S. W. 781.

The I. & G. N. surveys were not made until 42 years after the location of the Martinez grants, and concededly at a time when the west line of the two Martinez surveys were marked on the ground. The calls contained in such surveys for the Martinez lines and corners cannot meet the requisites of the rule of general reputation as hereinabove stated. Such surveys are certainly not concurrent with the establishment of the boundaries of the Martinez grants. This can also be said of the other junior surveys introduced in evidence. Linney v. Wood, 66 Tex. 22, 17 S. W. 244.

The admission of the junior surveys generally in evidence in boundary suits is fully discussed and the correct rules announced in the former opinion in this cause. 159 S. W. 391.

[10, 11] In justice to the trial court, it may be said that the junior surveys were admissible for the purpose of showing the general location of such surveys on the ground, and we think the instructions which the court gave to the jury when such evidence was admitted, to the effect that the junior surveys calling for the Martinez lines "were to be considered by the jury for all purposes, except that you will not consider the bald declaration as to the location of the line," was sufficient to limit the legitimate purpose of such evidence, and was so understood by the jury. After giving the jury such verbal instructions, it was not necessary to again cover the same matter in the court's written charge.

This disposes of assignments of error 1 to 6, and No. 19. The other several assignments of error have been considered, and, finding no merit in them, they are overruled.

It follows from what has been said that the Martinez grants were not surveyed on the ground. There is no marked west line or west line corners or other marked lines or corners on the ground which have been found or identified as having been made in 1833 by which appellees can overcome the field note calls for course and distance, so as to extend the lines and corners of said grants as claimed by them. These grants were "paper" or "office" surveys only, and their lines must be constructed by the calls for course and distance from the Trinity river, by the calls for the Trinity river, and the west line calls of the Philip Miller, and by so doing we think they can be fully identified and located on the ground.

Article 29 of decree 190 of the Congress of the state of Coahuila and Texas, dated in the city of Leona Viscaria April 28, 1832, among other things, provided:

"The surveys of vacant lands that shall be made upon the borders of any river, running rivulet, or creek, shall not exceed one-fourth of the depth of the land granted, should the land permit." Gammell's Laws of Texas, p. 302.

This decree was in force when the two Martinez grants were made, and it is evident from the shape of the surveys and the length of their north and south lines that the surveyor was endeavoring to conform to this decree.

Looking to the field notes of survey No. 9, we find that it is described as being "on the west bank of the Trinity river and in front of the league occupied by Philip Miller."

[12] Construing this language, the Court of Civil Appeals for the Third Supreme Judicial District, in the former opinion, said:

"Looking to the field notes of said surveys, we find that survey No. 9 is described as being in front of the league occupied by Philip Miller. Its lower corner is the same as the upper corner of No. 6, which is described as being 'adjoining in the middle of the river with the southwest corner of the league occupied by a colonist named Philip Miller.' As both the Philip Miller survey and Martinez No. 9 were leagues that were required by law to be of the same width fronting on the river, it would appear from this description that by the words 'in front of the league occupied by Philip Miller' would mean that the lines of the Philip Miller, if extended across the river the distance called for in the field notes of No. 9, would trace the upper and lower lines of said survey No. 9."

We are of the opinion that this is the proper construction to be placed upon the language of said field notes, and we adopt the same as our conclusion.

Extending the north line of the Philip Miller across the river to the west bank of the Trinity river where such line intersects the river at its most westerly point, we have the northeast or beginning corner of Martinez No. 9, and thus do not disturb any of the land included in the field notes of the Philip Miller; from there to the west 10,088 varas the second corner is reached; from there to the south 2,500 varas the third corner is reached; and from that point east 9,246 varas to the west bank of Horseshoe Lake, which we have heretofore determined was at the time of making such survey the west bank of the Trinity river, the fourth corner is reached, and from there following the turns of the old river channel upward (in accordance with the meander calls of the Trinity river, given in the Miller field notes), until arriving at the point of commencing, the league is constructed, as we believe it was the purpose and intent of the original surveyor to construct it, and without making any portion of its east and south lines conflict with the Philip Miller grant.

There is no dispute about the boundary lines of the two I. & G. N. surveys as they are located on the ground. Shattuc survey

No. 62 will therefore only include such territory as lies between the east line of I. & G. N. survey No. 38 and the west line of Martinez No. 9, as that line has been fixed by this court.

Martinez league No. 6, as described in the original field notes, "is situated on the western side of Trinity river adjoining in the middle of the river with the southwest corner of a league occupied by a colonist named Philip Miller, commencing from the laurel 12' in diameter upon the margin of the river," etc.

As we have heretofore determined, the true Philip Miller southwest corner is at a point on the east side of Horseshoe Lake, which at the time of the survey of the Philip Miller was a part of the Trinity river. Therefore the beginning corner of the Martinez survey No. 6 is at a point on the west side of the bank of Horseshoe Lake. This survey should then be constructed by running course and distance as follows: Thence west 10,609 varas second corner; from there to the south 2,500 varas, third corner; from thence to the east parallel with the north line of said survey to the east bank of the Trinity river; thence following the turns of said river, as the same is now found on the ground, upward, until a point is reached on said river opposite a deep gully which is a continuation of Horshoe Lake; thence following the meanders of said gully and lake in westerly, north, and northeast directions to the place of beginning.

The boundaries of Shattuc 63 and 64 should therefore be placed between the east lines of I. & G. N. surveys 38 and 39 and the west lines of Martinez grants 6 and 9, as fixed and determined by this court, and will only include such territory as lies in said area.

The judgment of the lower court is reformed and affirmed in accordance with this opinion.

### Motion for Rehearing.

We are asked in appellants' motion for a rehearing to make more specific the location of the southeast corner of league No. 9 and the northeast corner of league No. 6.

In the original opinion we use the following language in locating the boundaries of league No. 9:

"Extending the north line of the Philip Miller across the river to the west bank of Trinity river, where such line intersects the river at its most westerly point, we have the northeast or beginning corner of Martinez No. 9, and thus do not disturb any of the land included in the field notes of the Philip Miller; from there to the west 10,088 varas, the second corner is reached; from there to the south 2,500 varas the third corner is reached; and from that point east 9,246 varas to the west bank of Horeshoe Lake, which we have heretofore determined was at the time of the making of such survey the west bank of Trinity river, the fourth corner was reached; and from there following the turns of the old river channel upward (in accordance with the meander calls of the Trinity river given

in the Philip Miller field notes), until arriving at the point of commencing, the league is constructed."

We have heretofore specifically held that Horseshoe Lake was a part of the old Trinity river channel, and we mean to hold that when the south line of No. 9, extending eastwardly from the southeast corner, intersects the west bank of Horseshoe Lake, that it shall then meander the northern boundary of said lake until it meets with the old channel of said river on the east side of said lake, and thence follow the turns of the old river channel upward (in accordance with meander calls of Trinity river given in the Philip Miller field notes), until arriving at the point of commencement.

We desire to say also that it is to be noted in the original opinion that the beginning point in running this survey is at the northeast corner, from which point course and distance must be measured. We are not to be understood as authorizing a reversal of the calls, and as designating the measurements to start from the intersection of the south line of said league, with the west bank of Horseshoe Lake.

In locating the boundaries of No. 6, we used the following language:

"As we have heretofore determined, the true Philip Miller southwest corner is at a point on the east side of Horeshoe Lake, which lake, at the time of the survey of the Philip Miller, was a part of the Trinity river. Therefore the beginning corner of the Martinez survey No. 6 is at a point on the west side on bank of Horseshoe Lake. This survey should then be constructed by running course and distance as follows: Thence west 10,609 varas, second corner. From there to the south 2,500 varas, third corner. From thence to the east parallel with the north line of said survey to the east bank of Trinity river. Thence following the turns of said river, as the same is now found on the ground, upward, until a point is reached on said river opposite a deep gully, which is a continuation of Horseshoe Lake. Thence following the meanders of said gully and lake in a westerly, north, and northeasterly direction to the place of beginning."

We mean to determine that the beginning or northeast corner of No. 6 is on the west bank of Horseshoe Lake, at a point on said lake that would be reached by the Philip Miller south line if it was extended through to that point. Thence west 10,609 varas, second corner. Thence to the south 2,500 varas, third corner. From thence to the east parallel with the north line of said survey to the east bank of Trinity river. Thence following the turns of said river, as the same is found on the ground, upward, until a point is reached on said river opposite a deep gully, which is a continuation of Horeshoe Lake. This gully, according to the record, is well marked and defined on the ground, and runs up to within a short distance of the present west bank of the river. From said point on the river, thence in a westerly direction to a point that intersects the south side of said gully. Thence following the meanders of said gully along its south bank

and along the south and west banks of Horseshoe Lake to the place of beginning.

In thus fixing the boundaries of the two Martinez surveys, there will remain some area of land in the three Shattuc surveys, but we are unable to determine from the data at hand exactly how much territory will be included in said Shattuc surveys or to fix and determine the exact metes and bounds of such surveys. We therefore cannot make the judgment in this respect more specific than was done in the original opinion.

Judgment, however, should be affirmatively rendered for appellants and against appellees for such land as may be included in the Shattuc surveys, after locating the two Martinez surveys as herein determined, and the court below is instructed to ascertain the metes and bounds of said Shattuc surveys, in accordance with this opinion, either by appointing a competent surveyor, or otherwise, and to include in the record of this judgment below the field notes of the same.

It is further ordered by the court that all the costs of this case incurred prior to the time the cause was transferred to the district court of Liberty county be paid by the appellants; and that all costs incurred in the district court of Liberty county and this court be apportioned as follows: Two-thirds against appellants, and one-third against appellees. And in this apportionment, it is ordered that the costs incurred in serving the original citations upon appellees in this cause be included.

Appellants' motion for rehearing is, in all other respects, overruled.

### On Motion to Reform Judgment.

On appellants' motion to reform judgment, so as to fix the metes and bounds of that portion of the Shattuc surveys allotted to appellants: Since overruling appellant's motion for rehearing, the appellants have filed a motion to fix by metes and bounds that portion of the three Shattuc surveys allotted by the court to them; and in this connection have called our attention to data found in the record, which will enable us to do so. Therefore the motion will be granted, the metes and bounds of said surveys fixed, as requested, and the original opinion modified accordingly.

In the original opinion, the north line of Martinez No. 9 was determined to extend 1,270 varas further west, measured from the northeast corner, as located by the court, than it would otherwise do, measured from the corner contended for by appellants. Therefore that distance, to wit, 1,270 varas, must be deducted from the length of the north and south lines of Shattuc survey No. 62, as those lines were originally contended for by appellants. After making that deduction, appellants are entitled to recover the following portion of Shattuc survey No. 62, to wit: Beginning at the northeast corner of survey No. 38, I. & G. N. Railway Company, at its northwest corner; thence east along its original north line 1,023 varas to its northeast corner; thence south 1,577.6 varas to its southeast corner; thence west 1,023 varas to the east line of survey No. 38, I. & G. N. Railway Company, its original southwest corner; thence north with the east line of said I. & G. N. Railway Company survey 1,577.6 varas to the place of beginning, containing 285.81 acres of land.

After fixing the lines of Martinez No. 9, as was done in said original opinion, appellants are entitled to recover that portion of Shattuc survey No. 63 embraced in the following field notes, to wit: Beginning at the east line of survey No. 38, I. & G. N. Railway Company, at the original southwest corner of Shattuc survey No. 62; thence east with the south line of Shattuc survey No. 62 1,023 varas, the northeast corner of this tract and the southeast corner of that part of Shattuc survey No. 62 awarded to appellants by this court; thence south 472 varas to the north line of Martinez No. 6, as established by this court; thence west with said north line 1,023 varas to an original interior corner of said Shattuc survey No. 63; thence north to the place of beginning, containing 85.53 acres of land.

In the original opinion, the north line of Martinez No. 6 extends 1,805 varas further west, as located on the west bank of Horseshoe Lake, than it would do if measured from the intersection of said north line with the present location of Trinity river. Therefore the north and south lines of Shattuc surveys Nos. 63 and 64, lying immediately adjacent to Martinez No. 6 on the west, must be lessened accordingly. Appellants are therefore entitled to recover that portion of Shattuc survey No. 63 herein referred to, embraced within the following field notes: Beginning at one of the original northwest corners of Shattuc survey No. 63, which is an interior corner of I. & G. N. Railway Company survey No. 39; thence east 395 varas to the northwest corner of Martinez league No. 6, as established by this court, for the northeast corner of this tract; thence south 1,150 varas to the southeast corner of this tract; thence west 395 varas to the original southwest corner of Shattuc survey No. 63, on the east line of I. & G. N. Railway Company survey No. 39; thence north 1,150 varas to the place of beginning, containing 80.46 acres of land.

Appellants are also entitled to recover that portion of Shattuc survey No. 64, described as follows: Beginning at the original southwest corner of Shattuc survey No. 63, and the northwest corner of Shattuc survey No. 64; thence east 395 varas to the northeast corner of this tract; thence south 1,279.5 varas to the southeast corner of this tract, being the southwest corner of Martinez No. 6, as established by this court; thence west 395 varas to the original southwest corner

of Shattuc No. 64 on the east line of the James Dowell; thence north 1,279.5 varas with the east line of the Dowell and I. & G. N. survey No. 39, to the place of beginning, containing 89.56 acres of land.

### On Rehearing.

On account of the uncertainty in the testimony of the several surveyors respecting the length of the lines of Martinez 6 and 9, and as emphasized in appellees' motion for a rehearing, we find that we are in error in undertaking to definitely fix the metes and bounds of the Shattuc surveys. Therefore the opinion heretofore rendered on April 20, 1916, fixing the metes and bounds of the Shattuc surveys, is erroneous.

This being strictly a boundary suit, appellants are entitled to have the metes and bounds of the Shattuc surveys settled in this litigation. Therefore the trial court will appoint a surveyor, in accordance with instructions heretofore given, to ascertain the metes and bounds of said surveys, and for this purpose only this cause is remanded to the trial court.

[13] It is insisted that we erred in not holding that the location of the Shattuc surveys was absolutely void, for the reason that the deputy county surveyor, who located them, was acting for himself, and thus his acts were in violation of the law, and void.

No issue of this kind was made under the pleadings, nor urged, so far as the record discloses, in the trial court. In the trial court it was agreed by all the parties to the suit that the plaintiffs were the owners of the Shattuc surveys, and that the defendants were the owners of the Martinez surveys; that the Martinez surveys were the older surveys, and that the plaintiffs were entitled to recover to the extent that the Shattuc surveys were not in conflict with the older Martinez surveys. In accordance with this agreement, the court correctly charged the jury that there was no question of title involved in the case, and that all issues, except the one of conflict of the boundaries between said surveys, was eliminated. There was no request upon the part of the appellees to have the trial court peremptorily instruct the jury to render a verdict for them upon the ground stated, nor upon any other ground. They acquiesced in the submission of the cause to the jury upon special issues. The personal interest of the deputy surveyor, Jones, in the Shattuc surveys was developed on cross-examination, but no such advantage as is now urged was predicated on it in the trial court, nor was the agreement of counsel as to the title to the several surveys in any way modified or claimed to have been modified by them, as a result of such testimony. There is no cross-assignment of error by appellees on appeal, based upon such matter.

Under appellants' eighth assignment of error, as found in their brief, attack is made upon the charge of the court for certain reasons therein stated, and appellees' counsel states a counter proposition:

"That the court did not err in the charge, for the reason * * * that the court could, with propriety, have directed a verdict for the defendants on account of the Shattuc surveys having been illegally made; the testimony of the surveyor who located them having been to the effect that he located them for himself."

This proposition is not at all germane to the assignment in appellants' brief, and upon the agreed statement under which the case was tried, the title to the Shattuc surveys was entirely out of the case, and the court could not have directed a verdict for the defendants on account of the failure of title based upon the illegal conduct of the surveyor. Appellees are in no position to urge this question on appeal. The proposition is so hypocritical that we felt justified in passing it over without any specific mention in the original opinion.